**Jimmie Lee DYAS, Appellant,**

v.

**Art LOCKHART, Commissioner of the Ark. Dept. of Corrections, Appellee.**

No. 84–1524.

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1985.

Decided Aug. 28, 1985.

Rehearing and Rehearing En Banc Denied Oct. 15, 1985.

Leon Holmes, Little Rock, Ark., for appellant.

Leslie M. Powell, Asst. Atty. Gen., Little Rock, Ark., for appellee.

Before HEANEY and BOWMAN, Circuit Judges, and WANGELIN,* Senior District Judge.

HEANEY, Circuit Judge.

Jimmie Lee Dyas appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. For reversal he argues that the district court erred in deciding that Dyas's trial was not prejudiced by the familial relationship between the trial judge and the prosecutor, and that the verdict should have been set aside because of the ineffective assistance he received from his counsel at trial. We reverse and remand for a hearing before the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

In 1975, Jimmie Lee Dyas was convicted of capital felony murder for his role in the successful contract-murder plot to kill Eugene Zachry. Dyas was sentenced to life in prison without possibility of parole; Charles Watson Bean, who actually committed the murder, was sentenced to life in prison. On direct appeal, the Arkansas Supreme Court affirmed Dyas's conviction. *Dyas v. State*, 260 Ark. 303, 539 S.W.2d 251 (1976).

We have previously recounted the history of Dyas's attempts at post-conviction relief. *Dyas v. Lockhart*, 705 F.2d 993, 995 (8th Cir.1983). In that opinion, which considered Dyas's first appeal of his habeas petition, we remanded to the district court to conduct a hearing "on the question of whether Dyas knew about and nevertheless declined to accept Judge Steel's recusal offer." *Id.* at 996. If the district court

---

* The Honorable H. Kenneth Wangelin, Senior United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

determined that Dyas had not personally waived Judge Steel's disqualification offer, we directed it to consider Dyas's allegation of Judge Steel's actual bias; the district court was to give special attention to Judge Steel's relationship with the prosecuting attorneys, his overall conduct during the trial, and any instances of specific prejudice. *Id.* at 987.

In the district court's memorandum and order following the hearing we required, the district court declared that "the only claims worthy of discussion relate to the due process violation because the prosecuting attorney was the nephew of the presiding trial judge." *Dyas v. Lockhart,* No. PB–C–81–387, slip op. at 1 (E.D.Ark. March 12, 1985). In considering this claim, the district court noted that it had reviewed "the entire transcript of petitioner's trial and the published and unpublished opinions written in connection with petitioner's post conviction appeals." *Id.* pp. 1–2 (emphasis in original, footnote omitted). We believe that, although the district court diligently examined the record, these remarks in its opinion suggest that it did not fully discharge its obligation to conduct a hearing in conformity with our prior instructions, and so we again require a hearing on remand.

## II. THE BIAS OF THE TRIAL JUDGE.

The district court's opinion makes clear the unusual web of social and familial contacts that bind the principals in this criminal trial. Dyas was tried before Judge Bobby Steel (whose wife Daisy was the court reporter) and was prosecuted by George Steel, Jr., nephew of the judge. At the time of the trial, the prosecutor was dating the daughter of Boyd Tackett, Dyas's attorney, and the couple subsequently married. After recounting this remarkable chain of relationships, the district court found that Dyas "failed to point out any particular conduct [by Judge Steel] which supported such a claim [of judicial bias or prejudice]." *Id.* at 6. In his conclusions of law, the district court also found that, although Dyas "did not knowingly waive his objection to the fact that the presiding judge was related to the prosecu-

tor," he was "made aware of the judge's offer of recusal" before the trial had ended. The district court also concluded that Judge Steel had no financial stake in the outcome of Dyas's case. Finally, the district court concluded that the Arkansas Supreme Court did not require until 1980 that trial judges recuse themselves in cases in which they are related to the prosecutor, and that this requirement has not been applied retroactively. *Id.* at 8–9. *See Adams v. State,* 269 Ark. 548, 601 S.W.2d 881 (1980).

As adopted in Arkansas, the Code of Judicial Conduct (CJC) provides, in pertinent part, that:

C. Disqualification

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

\* \* \* \* \* \*

(d) he or his spouse, or a person within the third degree or [sic] relationship to either of them, or the spouse of such a person;

\* \* \* \* \* \*

(ii) is acting as a lawyer in the proceeding;

\* \* \* \* \* \*

D. Remittal of Disqualification.

A judge disqualified by the terms of Canon 3C(1)(c) or Canon 3C(1)(d) may, instead of withdrawing from the proceeding, disclose on the record the basis of his disqualification. If, based on such disclosure, the parties and lawyers, independently of the judge's participation, all agree in writing that the judge's relationship is immaterial or that his financial interest is insubstantial, the judge is no longer disqualified, and may participate in the proceeding. The agreement, signed by all parties and lawyers, shall be incorporated in the record of the proceeding.

35 Ark.L.Rev., 247, 256–59 (1981).

(The code was adopted in 1974, before Dyas's 1975 trial.) In construing this canon of the CJC, the Arkansas Supreme Court has declared, "[i]n cases arising in the trial court after this date, we construe our rule to require the judge to note his disqualification without any request by the lawyer." *Edmonson v. Farris,* 263 Ark. 505, 565 S.W.2d 617, 619 (1978) (en banc). Two years later, the Arkansas Supreme Court applied CJC canon 3 C to a criminal case tried by prosecutor Steel before Judge Steel; the court reversed the conviction for Judge Steel's failure to comply with canons 3 C and 3 D, and held that that appellant's failure to request compliance and to object to non-compliance was immaterial, because the judge was obliged to take the initiative on disqualification under both canons. *Adams,* 601 S.W.2d at 884.

▪ In light of the CJC provisions we have set forth, the cases construing them, the facts of this case, and the law of the case, we conclude that the district court erred in the manner in which it conducted its hearing. We note that CJC canons 3 C and 3 D were adopted in 1974, before Dyas was tried. Although *Adams* and *Edmonson* were decided after Dyas's trial, we noted in our previous opinion that "Dyas's claim here is brought under the due process clause of the fourteenth amendment, not under Arkansas rules for waiver of a judge's disqualification." *Dyas,* 705 F.2d at 996, n. 1. Thus, the decisions interpreting the CJC standards are useful guidelines for evaluating judicial conduct, as are the canons themselves, but the essence of the claim is a due process violation,[1] as we

indicated in our instruction on remand. Thus, *Adams* and *Edmonson* are not dispositive in this case.

The factors we directed the district court to consider on remand were the existence of Dyas's knowing and intelligent waiver and the possibility of actual prejudice. On the matter of the waiver, the district court found that, although Dyas "did not knowingly waive his objection" to the Steels' relationship, his attorney knew of the relationship and Dyas was informed by his attorney in closing argument about this relationship. *Dyas,* No. PB–C–81–387, pp. 9, 5. For Dyas to have waived his right in this fashion is a far cry from the Supreme Court's benchmark standard that a waiver is "ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

▪ We cannot accept the conclusion that Dyas waived his objection to Judge Steel's presence based on the information Dyas received for the first time in his counsel's closing statement,[2] nor can a waiver be imputed on the basis of Dyas's failure to raise this argument in his motion for new trial, on which he was represented by the same attorney. We note that Judge Steel made no inquiry on the record that Dyas was aware of the Steels' relationship, which would have been the proper course of action in the circumstances. The district court's finding of a waiver here was clearly erroneous, particularly in light of the district court's finding that Dyas was unap-

---

1. We also note that sources that antedate even the adoption of the CJC support the conclusion that Judge Bobby Steel's role in the trial might be grounds for finding a due process violation. The Arkansas Constitution provides that "No judge or justice shall preside in the trial of any cause in the event of which he may be interested, or where either of the parties shall be connected to him by consanguinity or affinity, within such degree as may be prescribed by law * * *." Ark. Const. Art. 7, § 20. In addition, in *Byler v. State,* 210 Ark. 790, 197 S.W.2d 748 (1946), the Arkansas Supreme Court reversed a murder conviction where the appellant discovered after trial that the victim was the judge's wife's second cousin. The court noted that, although disqualification could be waived, "it is

not waived by one who proceeds to trial in ignorance of the fact [of the judge's relationship to a principal]." *Id.* 197 S.W.2d at 751.

2. Dyas's attorney said:

"* * * Thank God I've got a friend up there on that bench that's just as good to me as he is his own kinfolks. You know, he offered to withdraw from this case and not try it because he has a nephew as the prosecuting attorney[,] * * * and I said 'Good God, I had rather try a case in front of Judge Bobby Steel than any judge in the United States because he's going to be fair to everybody, I'll guarantee you that.'"

prised of the relationship until the trial was over, and his finding that Dyas did not understand that he had an absolute right to require recusal. *Dyas*, No. PB–C–81–387, at 9. Therefore, because we find no knowing and intelligent waiver of Dyas's objection, we turn to the question of actual prejudice.

█ The district court erred in reviewing the record for actual bias as it did. Although the court appears to have reviewed the record carefully for evidence in support of the conviction, the district court ignored some of the instances of potential bias to which Dyas directs our attention.[3] Although Judge Steel was apparently patient and considerate in the rulings he made on many of the motions and objections in this emotional trial, Dyas points out several dangerous areas of potential bias. First, the record suggests that Judge Steel involved himself in the process of evidence-gathering in this case and then made several crucial rulings on the admissibility of evidence and the continuation of the trial. A police officer testified that Dyas's defense attorney, Boyd Tackett, Sr., had gone to Judge Steel's house with two rings that had been removed from the victim's body. The officer testified that the Judge's wife had called him and asked him to come to the Steel's residence, where Tackett gave the officer the rings. The officer testified that Tackett told him the rings had come from Dyas's wife, Bunkie. At trial, Tackett disputed the source of the rings and asked Judge Steel to testify regarding the source of the rings. Although the Judge declined to testify at that point in the trial, when Tackett later argued that he had not shown the rings to the police officer, Judge Steel corrected him with the remark, "No sir. You did show him there," which prompted Tackett to agree with the Judge. This unusual set of circumstances does not in itself manifest actual prejudice, but it demonstrates Judge Steel's personal knowledge of the facts which, when coupled with his avuncular relationship with the prosecutor, calls into question the propriety of his denial of Dyas's motion for a mistrial over the officer's testimony regarding the rings.

Dyas also suggests that Judge Steel's evidentiary treatment of the rings was important because the rings were critical evidence contradicting Dyas's account of his coerced involvement in the murder and because the theft of the rings constituted the underlying felony which supported his charge of capital felony murder. Although the district court recounted physical evidence which implicated Dyas in the murder, the rings were the strongest piece of evidence corroborating the testimony of co-defendant Charles Bean. Thus, Judge Steel's denial of the motion for a directed verdict presents another important ruling which might suggest bias in that his personal knowledge and his familial relationship might have been implicated.

Finally, Dyas cites Judge Steel's denial of his motion for a new trial as an incident of actual bias. Dyas argues that the prosecutor represented at Dyas's trial that co-defendant Bean had been promised nothing for his testimony. Yet after Bean testified against Dyas, his charge of capital murder was reduced to first degree and the prosecutor recommended a simple life sentence at Bean's sentencing hearing. Dyas argues that this potential misrepresentation of facts to the jury by the prosecutor may have justified a new trial and that, in denying it, Judge Steel may have manifested actual prejudice.

Despite the district court's review of the record, we believe its failure to review these critical issues is an oversight as regards our instructions to conduct a hearing on the question of actual prejudice. Thus, on remand the district court will conduct a hearing on these issues and whatever other instances of prejudice that Dyas suggests may be found in the record which we directed the district court to review in our

---

**3.** We note that, because the district court declined Dyas's offer of an abstract of the record and agreed to review the entire record, *Dyas* No. PB–C–81–387, slip op. at 1, Hearing Transcript 26–27, the entire trial record was presented before the district court, which gave the state notice of the material at issue there and before this Court on appeal.

previous opinion. *See Dyas*, 705 F.2d at 997.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL.

■ In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court announced a two-pronged test for evaluating the validity of claims regarding ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* 466 U.S. at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

We have carefully reviewed the allegations which Dyas raised in his original *pro se* handwritten petition which supplemented the petition counsel prepared for him. Individual lawyers may differ on tactical choices at trial, and although we might disagree with some aspects of the trial strategy embraced by Mr. Tackett, we cannot say that his representation of Dyas was ineffective according to constitutional standards.

Therefore, we affirm on the ineffective assistance of counsel issue, reverse on the waiver question, and reverse and remand on the issue of actual prejudice. The district court shall hold a hearing on the latter issue in accord with the instructions set forth in this opinion.