**O.C. Chick FERO, Petitioner–Appellant,**

v.

**Dareld KERBY, Respondent–Appellee.**

No. 93–2201.

United States Court of Appeals, Tenth Circuit.

Oct. 28, 1994.

**1466**

Tova Indritz, Federal Public Defender, Albuquerque, NM, for petitioner-appellant.

Gail MacQuesten, Asst. Atty. Gen. (Tom Udall, Atty. Gen., with her on the brief), Santa Fe, NM, for respondent-appellee.

Before HOLLOWAY and McKAY, Circuit Judges, and THEIS, District Judge *.

---

* Honorable Frank G. Theis, Senior United States District Judge for the District of Kansas, sitting

HOLLOWAY, Circuit Judge.

Petitioner Fero appeals from an order of the United States District Court for the District of New Mexico, dismissing with prejudice his habeas corpus petition brought pursuant to 28 U.S.C. § 2254 against respondent Kerby, Warden of the Central New Mexico Correctional Facility.

## I

### Background

On June 20, 1985, Fero was convicted of first degree murder by a New Mexico state jury. This conviction was affirmed by the New Mexico Supreme Court in February 1987 after a direct appeal. *See State v. Fero,* 105 N.M. 339, 732 P.2d 866 (1987) (*Fero I*). A subsequent motion for a new trial based on newly discovered evidence was denied and that order was affirmed in July 1988. *State v. Fero,* 107 N.M. 369, 758 P.2d 783 (1988) (*Fero II*).

Having presented all of his claims to the state courts, Fero pro se petitioned the district court for federal habeas relief, asserting the same issues raised before the New Mexico Supreme Court: (1) whether the trial court erred in refusing to declare a mistrial, or suppress testimony, when it came to light that the State had lost potentially exculpatory evidence; (2) whether the trial court erred in failing to grant a mistrial for three instances of prosecutorial misconduct; (3) whether petitioner was deprived of his right to an impartial judge where the trial judge's son, a law student, worked as a clerk for the prosecution on petitioner Fero's case, and the trial judge's brother-in-law, an attorney, had filed a civil action against petitioner prior to trial on behalf of the deceased's family; (4) whether the trial court's refusal to instruct the jury on lesser included manslaughter offenses violated petitioner's right to due process and a fair trial; and (5) whether petitioner's rights to due process and a fair trial were violated when the trial court judge informed the jury that petitioner was not facing the death penalty, but refused to instruct

by designation.

them that petitioner was facing life imprisonment if convicted.

In March 1989 the magistrate judge recommended that claims (3)–(5) be summarily dismissed. Subsequently Fero, still acting pro se, filed a response to this recommendation stating that he did not object to summary dismissal of claims (3)–(5). Fero also requested that counsel be appointed to prosecute his remaining claims. On April 10, 1989, the district judge adopted the magistrate's proposed findings and recommended disposition and dismissed grounds (3)–(5).

In April 1989 the magistrate judge appointed the Federal Public Defender's Office to represent Fero. Soon thereafter, Fero's new attorney filed a brief with the magistrate judge addressing all five of Fero's claims, the two remaining claims and the three previously dismissed claims, and requested that the previously dismissed claims be reconsidered.

In May 1993 the magistrate judge denied Fero's motion for reconsideration and recommended that Fero's petition be denied. Fero objected to the magistrate judge's recommendation, and moved the district court to reconsider its dismissal of claims (3)–(5). On July 6, 1993, the district court adopted the magistrate judge's proposed findings and disposition and dismissed Fero's petition with prejudice.[1] On July 28 the district court declined to grant Fero a certificate of probable cause.

Fero appeals the district court's July 6, 1993, order dismissing his petition, raising the five issues set out above. Believing that Fero raises issues that are debatable, we grant his application for a certificate of probable cause, see 28 U.S.C. § 2253; *Bowser v. Boggs*, 20 F.3d 1060, 1062 (10th Cir.1994),

*cert. denied,* —— U.S. ——, 115 S.Ct. 313, 130 L.Ed.2d 275 (1994). Fero, having presented these issues to the New Mexico Supreme Court, has satisfied 28 U.S.C. § 2254(b)'s exhaustion requirement.

## II

### The Carpet Evidence Issue

#### A

While Fero admits shooting the victim, Paul Hansen, he contends that he acted without the necessary deliberation, or mens rea, required for first degree murder. Fero says that during the murder investigation the police removed from beneath Hansen's head a piece of bloody carpet with a bullet hole in it. This piece of carpet, which Fero claims to be critical evidence, was lost by the State prior to trial but was subsequently recovered and provided to the defense after trial. Fero argues that the post-trial examination of this carpet by a defense expert proves that he did not act with the necessary deliberation; therefore, the State's failure to produce this evidence violated his right to due process.

At trial the State introduced the testimony of Dr. Smialeck, Chief Medical Examiner for the State of New Mexico, who performed the autopsy of the victim. The defense assumed that Smialeck was being called merely to establish the *corpus delicti* of the crime charged. *See* State R. at 363. Smialeck testified that Hansen had been struck by five 38–caliber bullets. This testimony was introduced without objection. However, when Smialeck sought to testify regarding the firing of the bullets and Fero's position relative to Hansen when Fero shot him, the defense vigorously objected.[2]

---

1. The district court did not explicitly address Fero's request that it reconsider claims (3)–(5).

2. At trial Smialeck stated:

 When Hansen was in a face down position causing this particular pooling of blood, the gunshot wound, the gunshot wound that was inflicted on the back, the left side of the neck, that traveled through the base of the skull, exited from the front of the neck which had fragmented, left some fragments in the, at the base of the skull, would have been the missile that left fragments in this particular location

which I believe these particular pieces of material represent particles of the slug.
State R. at 363. The prosecutor then asked Smialeck if he had an opinion as to what position Hansen's body was in when this bullet was fired, to which he responded that "[t]he particular presence of the missile fragments beneath the, the body when it was in a face down position as it was described as being originally found, I believe...." *Id.* At this point the defense made the following objection:
 At this time in order to properly cross-examine this witness on this hypothetical, because you are talking about fragments on the carpet, the

The defense claimed that the prosecution's failure to provide it with the carpet for examination, despite numerous promises to do so, made it impossible to effectively cross-examine Smialeck. This objection was overruled. Smialeck then testified that the first three shots were fired directly at Hansen, from across Hansen's desk—which separated the assailant and Hansen—with the assailant standing face-to-face toward Hansen.[3] He said the assailant fired the final two shots while standing in a position near Hansen's feet, firing in a downward direction towards the back of Hansen's head, which was face down. *See* State R. at 352, 366; Tr. T. 13.[4] It was Smialeck's opinion that one of these two final shots was probably instantly fatal because it struck Hansen in the brain stem. This shot, according to Smialeck, entered the back of Hansen's neck, exited the front of Hansen's neck, and left bullet fragments on the carpet located beneath Hansen's head. *See* State R. at 366; Tr. T. 13. The defense moved for a mistrial. That motion was denied.

Fero was convicted of first degree murder. He appealed to the New Mexico Supreme Court claiming, *inter alia*, that the trial court erred in not ruling that the State's suppression of the carpet denied him a fair trial. In rejecting this argument, the New Mexico Supreme Court held that Fero had failed to suggest how he would have used the carpet evidence to cross-examine Smialeck; that Smialeck did not rely on the evidence in testifying; and that the determination of whether the evidence was material was left to the trial court's sound discretion. The court affirmed the trial court's rulings as to the carpet evidence, making the following

district attorney cut out some samples of the carpet, we found out. They have never been produced, haven't been shown to us, not been discovered.... [sic] as part of the evidence of the crime scene, they have been unable to produce it to us, and we demanded them and they admitted that they got it and in order to properly cross-examine this witness, I need those carpet samples and the blood stains and so forth and to deny an individual these would be a denial of confrontation to, to the defense and the denial of proper cross-examination....

*Id.* at 364.

findings which we presume correct, *see* 28 U.S.C. § 2254(d):[5]

Fero was the principal of Tohatchi High School. The Superintendent of Schools for the Gallup–McKinley school system, which included Tohatchi, was Paul Hansen. Both men resided in the Tohatchi Teacherage, whose administration was also Fero's responsibility as principal. This arrangement evidently caused friction between the two men. By all accounts, Fero was extremely conscientious and hard working, a perfectionist. To some he even seemed obsessed with his duties, a man for whom his "job was his life and his life was his job."

After several postponements and cancellations, Hansen scheduled an evaluation of Fero's employment for the morning of February 22, 1985, at Hansen's office in Gallup. Witnesses testified that the day before the evaluation, Fero seemed to be depressed, disturbed, even suicidal. He had drafted a will, boxed his personal belongings and left his life insurance policy prominently on a chair in his office. That night Fero called a close friend and read to her several "goodbye" letters he had written to his parents and his daughter.

On the morning of the evaluation, Fero stopped by his school and told his assistant, Carl Montoya, "I won't be seeing you again." Then he drove into Gallup for his 9:00 a.m. appointment. Carrying his customary files and a portfolio, he appeared calm in casual conversation with witnesses in the central offices, before entering Hansen's office just after 9:00. At approximately 10:00 a.m., five shots rang out.

3. Fero conceded at trial that he was the individual who shot Hansen.

4. This is consistent with the testimony of Hansen's secretaries who testified that they first heard three shots, then a pause between the third and fourth shots, and then two more shots, *i.e.*, the fourth and fifth shots. *See* I Supp.R. at Doc. 24, p. 14.

5. These subsidiary findings are not challenged by Fero. We recite them as background here, although they bear particularly on the question of the materiality of the withheld carpet evidence, discussed below. *See* Part II–B, *infra*.

Soon afterward, Fero came out calmly, instructed the secretary to call the police and told two other employees that everything was okay. These two men testified that he appeared "normal."

Proceeding down the hall, Fero entered the office of Hansen's assistant, Bud Hendrickson, and handed him his school keys. He then called Montoya, told him that he had shot Hansen, and referred to some papers he had left for Montoya. Next he went into Hendrickson's inner office and sat down, calmly informing Hendrickson that he had shot Hansen because of his insistence on negative criticism and his refusal to appreciate the positive aspects of Fero's performance as principal. Fero handed Hendrickson his portfolio with the gun in it. He was arrested and gave a statement to the police.

In it, Fero stated that Hansen ridiculed and threatened him, fired him, and then offered a handshake with the words, "This is not personal." Fero started to stand up to leave, he recounted, at which point the gun fell out of his portfolio onto his lap. The next thing he remembered was seeing Hansen lying on the floor, then bending down to touch him. Fero explained how the gun had ended up in his portfolio after he and a teacher had been searching for a prowler around the Teacherage a few days earlier.

At trial, the defense requested and received an instruction on second degree murder based on mental illness. The court, however, denied defense requests for instructions on voluntary and involuntary manslaughter. The jury found Fero guilty of first degree murder, for which the court imposed a sentence of life imprisonment. This appeal followed.

*Fero I,* 105 N.M. at 341–42, 732 P.2d at 868–69.

While Fero's direct appeal to the New Mexico Supreme Court was pending, the piece of carpet was inadvertently discovered by the Gallup police in a boiler room in the Gallup Police Station. Consequently on October 15, 1986, Fero filed a post-trial motion for a new trial based on a newly discovered evidence theory. In May 1987 the State trial court held an evidentiary hearing on the motion.

At the hearing the defense introduced the testimony of Dr. Jerry O'Donnell, a forensic chemist with a private laboratory.[6] O'Donnell observed that for purposes of testifying the defense had provided him with the carpet evidence, including the padding. He described this evidence as a single piece of carpet, about twenty-eight by thirty-eight inches.[7] The carpet appeared to have a hole in it, consistent with the type and size that a 38–caliber bullet might make.[8] O'Donnell believed that this hole was made when the bullet, which Smialeck determined had entered the back of Hansen's neck and was probably instantly fatal because it hit Hansen's brain stem, exited from Hansen's body through the front of his neck and passed through the carpet beneath Hansen's head.

O'Donnell testified that he conducted a series of tests in an effort to determine the angle and position of Fero's gun when he fired the shot that made the hole. Based on these tests, he concluded that the angle that the bullet was traveling when it pierced the carpet was the same angle that the bullet was traveling when it struck the back of Hansen's head. O'Donnell did not believe that the bullet's striking Hansen's head be-

6. O'Donnell had previously been the director of the Albuquerque Police Crime Laboratory for seven years.

7. The prosecutor, Mr. Aragon, stated at trial that there were in fact two pieces of carpet, each the size of a medium pizza. It later turned out that there was only one piece of carpet. At the May 1987 evidentiary hearing, Aragon admitted that he stated at trial that there were in fact two pieces of carpet of the aforementioned size. However, he observed that at the time of trial he was operating under the assumption that there were two pieces of carpet of medium-pizza size because he had instructed the police to cut out two pieces of carpet. The police, however, did not follow his instructions. At the time of trial, Aragon said he had never seen the carpet evidence before.

8. At trial the prosecution represented to the court and to defense counsel that there were no "bullet hole[s]" or "indentations" in the carpet where the fragments were left. *See* State R. at 365.

fore hitting the carpet would have changed the bullet's trajectory. In conducting his experiments, O'Donnell endeavored to simulate the passage of a bullet through human bone and tissue and the carpet. O'Donnell concluded, unlike Smialeck, that Fero fired all five bullets from Fero's side of the desk, including the last two.

Fero's trial counsel, Mr. Gaddy, also testified at the May 1987 evidentiary hearing on the motion for a new trial. He said that on March 27, 1985, he had traveled to Gallup to review the physical evidence and the list of the State's witnesses. At that time Gaddy and his associate, Mr. Slosberg, met with the prosecutor, Mr. Aragon, at Aragon's office in Gallup. After Gaddy had reviewed the list of witnesses, Aragon escorted Gaddy and Slosberg to the Gallup Police Station so that the defense could examine the physical evidence in the State's possession. Gaddy testified that at the station he made a detailed list of every piece of evidence that was shown to him. Twenty-two items were shown to him, but the carpet was not one of them.

Gaddy also testified that three or four weeks prior to trial in 1985, he was called by Aragon and informed that there was an additional item of evidence which the prosecution might seek to introduce at trial, the carpet. Gaddy at this time asked to have access to the carpet so that he could have it independently examined. Aragon agreed to provide the carpet to Gaddy. Though promised by the prosecution, a week before trial the carpet still had not been delivered to Gaddy's office. Gaddy called Aragon and repeated his request for the carpet. Aragon told him that it had been lost. Gaddy told Aragon that the defense would object to any admission of evidence regarding the carpet. Since the State's witness list did not include any witnesses whom the defense had not questioned and who would testify about the significance of the carpet evidence, the defense decided not to press the issue. Gaddy said that at no time prior to or during the trial in June 1985 was the carpet made available to the defense. The first time the defense ever saw the carpet was after Fero had been convicted.

In response to Gaddy, the State introduced testimony by Captain Coriz of the Gallup Police Department. Coriz said that he met with Gaddy, Slosberg, and Aragon at the Gallup Police Station on March 27, 1985. He was there to show Gaddy and Slosberg the physical evidence in the possession of the police. He was instructed to show them only evidence which they specifically requested. Coriz testified that he showed Gaddy and Slosberg all of the evidence that was being held in the station's evidence safe. He did not show them the carpet, a light fixture, and the victim's personal items which were being stored in the station's boiler room. Apparently the carpet, which was soaked with Hansen's blood, was put in the boiler room to dry. Coriz maintained that he asked Gaddy if he wanted to see the carpet, but was told by Gaddy that he would look at it some other time, and he reserved the right to do so.

Coriz explained the discovery of the carpet. He said that another officer was in charge of securing the carpet evidence. That officer retired from the police department prior to the discovery of the carpet. After the officer retired, and several months after Fero had been convicted, Coriz and another officer entered the boiler room so that the officer could familiarize himself with the room's contents. At this time the carpet was found. Coriz said that nobody actually looked for the carpet; it was found inadvertently. Coriz immediately informed Aragon of the discovery.

On July 27, 1987, Fero's motion for a new trial based on newly discovered evidence was denied by the trial judge. *See* State R. at 397. The judge concluded that Fero had satisfied the materiality requirement of New Mexico's newly discovered evidence rule, but he had failed to meet the rule's five other requirements.[9] Arguing that the trial court

---

9. To be entitled to a new trial in New Mexico based on newly discovered evidence, the evidence must meet six requirements:
(1) It will probably change the result if a new trial is granted; (2) it must have been discover-ed since the trial; (3) it could not have been discovered before the trial by the exercise of due diligence; (4) it must be material; (5) it must not be merely cumulative; and (6) it

abused its discretion in denying his motion, Fero appealed this ruling. The New Mexico Supreme Court held a hearing on May 9; 1988, and affirmed the ruling on July 29, 1988. The New Mexico Supreme Court held that Fero's motion was properly denied under both tests that applied to his theories.

First, under the loss of evidence test, the State did not act in bad faith regarding the loss of the carpet, in which case the defendant had to show that the evidence was material and prejudicial to satisfy the test under *State v. Chouinard*, 96 N.M. 658, 663, 634 P.2d 680, 685 (1981), *cert. denied*, 456 U.S. 930, 102 S.Ct. 1980, 72 L.Ed.2d 447 (1982). The evidence was not material because the result of the trial would not have been different had the carpet evidence been disclosed. Whether Fero stood in front of or behind the desk when the last two shots were fired, the evidence showed he took time to reaim and fire the last two shots and then stopped firing though he knew the chamber contained a sixth live round. The evidence was consistent only with a theory that Fero fired with the intent to kill, and not in a robot-like fashion. And the loss of the carpet was held not to have prejudiced Fero in view of the other evidence (his announcement before the interview of his intention to kill Hansen, taking the gun with him, and the

sequence of firing the five shots). *Fero II*, 107 N.M. at 371, 758 P.2d at 785.

Second, the New Mexico Supreme Court held that Fero did not satisfy the test for a new trial based on the six requirements of *State v. Volpato*, 102 N.M. 383, 696 P.2d 471 (1985), where the defendant claims there is newly discovered evidence. The court concluded that the evidence was not material and would not change the result in a new trial. Furthermore, the court concluded that the evidence was not newly discovered evidence and had been available before the trial. *Id.*, 107 N.M. at 371, 372, 758 P.2d at 785, 786.[10]

### B

"Due process requires that the government disclose to the accused all evidence that is both exculpatory and material." *United States v. Fleming*, 19 F.3d 1325, 1330 (10th Cir.1994) (citation omitted), *cert. denied*, —— U.S. ——, 115 S.Ct. 93, 130 L.Ed.2d 44 (1994). "In recent years the Supreme Court has developed a framework to analyze what might loosely be called the area of constitutionally guaranteed access to evidence." *United States v. Femia*, 9 F.3d 990, 993 (1st Cir.1993) (internal quotations and citations omitted). The foundation of this framework is *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady*, the

must not be merely impeaching or contradictory.
*Fero II*, 107 N.M. at 371–72, 758 P.2d at 785–86.

**10.** In that opinion in *Fero II*, the New Mexico Supreme Court also stated:

At trial, there was no dispute that Fero killed Hansen. At issue was defendant's intent. The state argued that the murder was deliberate, while defendant claimed that he acted without intent during a brief psychotic episode. The state called as a witness Dr. John Smialeck, the medical examiner, who testified as to the cause of death. Over defendant's objection, Dr. Smialeck opined that Fero fired four non-fatal shots mostly to the head region before firing the fifth and fatal shot to the back of Hansen's head. *Fero [I]*, 105 N.M. at 344, 732 P.2d at 871. The first shot hit the victim in the mouth, the second in the cheek, the third in the arm as Hansen started to fall. Defendant then walked around Hansen's prone body and fired two more shots from the feet area of the victim. The fifth shot was instantly fatal enter-

ing the back of the neck into the brain stem. The sixth shot remained unfired in the gun. During the investigation, the police removed pieces of carpet, the size of a "medium pizza", on which they had found the body. These pieces, however, were lost a few days before trial and found again after defendant's first motion for a new trial. Dr. Smialeck never saw the carpet pieces and did not refer to them in his testimony.

. . . .

Thereafter, defendant moved for a new trial based upon an analysis of the lost carpet as newly discovered evidence. An evidentiary hearing on the motion was held. Defendant's expert testified that the carpet showed that defendant fired the fifth, fatal shot from a position in front of the victim's desk rather than from behind it as testified to by the state's medical examiner. Defendant claimed that by eliminating the steps he had to take to walk behind the desk to fire the last shots, this indicated he acted without the requisite intent needed for a conviction of first degree murder. *Fero II*, 107 N.M. at 369–70, 758 P.2d at 783–84.

Court pronounced the basic principle that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97.

■ It is undisputed that the carpet evidence could not be located by the State when the defense requested it. Thus at least initially the carpet evidence was subject to the rule stated in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). *Youngblood* noted that *Brady* makes the good or bad faith of the State irrelevant when it fails to disclose to the defendant material exculpatory evidence. 488 U.S. at 57, 109 S.Ct. at 337. However, it was held that the Due Process Clause "requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* The Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* As noted in *United States v. Femia,* 9 F.3d at 993:

> The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. *Brady* and its progeny address exculpatory evidence still in the government's possession. *Youngblood* and [*California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) ] govern cases in which the government no longer possesses the disputed evidence.

Here, however, the carpet evidence was later discovered during the pendency of Fero's direct appeal. Once the evidence was found, it could be and was tested by the defense and there was no task of guessing as to its probative value. We therefore agree with Fero that reliance on *Youngblood* in these circumstances is misplaced.[11] Therefore, Fero's due process claim must be determined under the standard of *Brady.*

■ To establish a *Brady* violation, the defense must prove that the prosecution suppressed the evidence, the evidence would have been favorable to the accused, and the suppressed evidence was material. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97. However, with respect to the first element, we have held that negligent or inadvertent suppression of evidence is nevertheless suppression for *Brady* purposes. *United States v. Montoya,* 716 F.2d 1340, 1345–46 (10th Cir.1983). Here the carpet was apparently misplaced inadvertently. Nevertheless, despite numerous requests for the carpet evidence and promises by the prosecution that it would be produced, it was not given to the defense until after it was rediscovered after trial. Thus the first element of a *Brady* violation was established.[12]

■ Our next inquiry is whether the carpet evidence would have been favorable to Fero—the second element of a *Brady* violation. We are persuaded that it would have been. In addition to using the carpet to support Fero's theory that he shot Hansen during a brief psychotic episode, Fero could use the carpet to attack Dr. Smialeck's credibility as to the angle of the fifth shot. In sum, the suppressed evidence arguably supported Fero's defense and we believe it was favorable to the defense for *Brady* purposes.

■ Materiality is the third requirement of a *Brady* violation. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383,

---

11. The magistrate judge relied on analysis under *Youngblood* and said that Fero failed to show that the prosecution suppressed evidence. Magistrate Judge's Proposed Findings and Recommended Disposition of May 24, 1993, at 9.

12. Because the police are considered agents of the prosecution for *Brady* purposes, the fact that it was the police and not the prosecutor who misplaced the carpet, is irrelevant. *United States v. Buchanan,* 891 F.2d 1436, 1442 (10th Cir. 1989), *cert. denied,* 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990).

87 L.Ed.2d 481 (1985) (opinion of Blackmun, J., joined by O'Connor, J.); *id.* at 685, 105 S.Ct. at 3385 (White, J., concurring in part and concurring in the judgment, joined by Burger, C.J., and Rehnquist, J.) (applying same materiality standard). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Hughes,* 33 F.3d 1248, 1251 (10th Cir.1994). This question of materiality and the possible effect of the withheld evidence is a mixed question of fact and law. *Ballinger v. Kerby,* 3 F.3d 1371, 1375 (10th Cir.1993).

Considering the entire record, we believe there was strong evidence indicating that Fero deliberately killed Hansen and supporting the first degree murder conviction. The New Mexico Supreme Court reasoned that:

> The result of the trial would not have been different if defendant had had the carpet in his possession....
>
> The record indicates that defendant had announced his intention to kill the victim prior to the evaluation, he took a gun with him to the evaluation session, he fired three shots at point-blank range at Hansen's head, and then reaimed and fired two more shots at Hansen's head. After the shooting, defendant told a secretary to call the police and, subsequently, told the assistant superintendent what he had done and why he did it. In light of the evidence presented, which is consistent with a theory of premeditated murder, we are unable to conclude that the loss of the evidence prejudiced defendant's case.

*Fero II,* 107 N.M. at 371, 758 P.2d at 785.

We are convinced that the conclusion of the New Mexico court was correct. We hold that the evidence was not material under the standard applied by the Supreme Court in *Bagley.* Accordingly, Fero has not established a due process violation under *Brady.*

### III

### The Claim of Prosecutorial Misconduct

Fero claims that three instances of allegedly improper conduct by the State prosecutors violated his due process rights. He also argues that the cumulative effect of these acts denied him due process.

Such allegations of prosecutorial misconduct present mixed issues of law and fact, subject to *de novo* review. *See Nichols v. Sullivan,* 867 F.2d 1250, 1253 (10th Cir.), *cert. denied sub nom. Nichols v. Tansy,* 490 U.S. 1112, 109 S.Ct. 3169, 104 L.Ed.2d 1031 (1989). In determining whether a petitioner is entitled to federal habeas relief for prosecutorial misconduct, it must be determined whether there was a violation of the criminal defendant's federal constitutional rights which so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 645, 94 S.Ct. 1868, 1871, 1872, 40 L.Ed.2d 431 (1974). A showing which might call for application of supervisory powers is not sufficient "for not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.' *Lisenba v. California,* 314 U.S. 219, 236 [62 S.Ct. 280, 289–90, 86 L.Ed. 166] (1941)." *DeChristoforo,* 416 U.S. at 642, 94 S.Ct. at 1871. *See also Hopkinson v. Shillinger,* 866 F.2d 1185, 1210 (10th Cir.1989) (the appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3256, 111 L.Ed.2d 765 (1990).

### A

The first instance of alleged misconduct was the prosecutor's improper remarks during rebuttal. The prosecutor asked the jury to "[g]ive justice to Mrs. Paul Hansen and her young son who have stayed in the courtroom the past four days." The defense moved for a mistrial, which was denied. Fero maintains that these remarks were intended to appeal to the jury's sense of sympathy and prejudice. He claims the prejudice was exacerbated because the statement was made immediately before the jury began its deliberations and the trial judge did not give specific instructions to the jury to disregard the improper remarks. Fero contends that the general instruction the judge gave to

the jury, that sympathy or prejudice should not play a role in the verdict, was insufficient to remedy the prosecutor's alleged misconduct.

In evaluating claims of prosecutorial misconduct based on improper remarks made by the prosecutor, we have stated:

> To view the prosecutor's statements in context, we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly "could have tipped the scales in favor of the prosecution." ... We also ascertain whether curative instructions by the trial judge, if given, might have mitigated the effect on the jury of the improper statements.... When a prosecutor responds to an attack made by defense counsel, we evaluate that response in light of the defense argument.... Ultimately, we "must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly."

*Hopkinson,* 866 F.2d at 1210 (internal quotations and citations omitted); *see also United States v. Solivan,* 937 F.2d 1146, 1156 (6th Cir.1991).

In light of the ample evidence of guilt which we have detailed earlier, and the general instruction on sympathy and prejudice which we presume the jury followed, we are not persuaded that the remarks, while clearly improper, denied Fero a fair trial or infringed his right to due process.

### B

■ The second act challenged by Fero is the prosecutor's cross-examination of Carol Shiffley, Fero's friend and co-worker. The prosecutor asked Shiffley to read silently the transcript of a statement prepared by a defense investigator after he had interviewed her. The prosecutor then asked Shiffley to read aloud the portions of the statement with which she disagreed. Shiffley proceeded to read:

> Shiffley said she never heard Chick Fero make a definite threat toward Paul Hansen, but she said that in the spring of 1984 she was talking with Fero about Hansen

and during that conversation Fero said something like, "the only thing Hansen understands is violence," and Fero made the outline of the pistol with his hand and held it to his head.

Defense counsel objected, and the trial judge sustained this objection. Defense counsel also requested a mistrial, which the court denied. Defense counsel then asked the judge to admonish the jury, which the court did: "You are to disregard that statement as being a statement made by Mr. Fero to Shiffley, since she did deny that she made that statement. So you are to disregard it." According to Fero, the court's curative instruction could not effectively eradicate the prejudicial effect of the cross-examination.

The State argues that Fero has not shown that Shiffley's cross-examination rendered his trial unfair. Moreover, the evidence was cumulative of Katie Weber's testimony that Fero told her that Hansen didn't deserve to live and that he [Fero] could kill him;[13] the report was prepared by a defense investigator; Shiffley denied making the statement; and the judge gave a curative instruction. Consequently, the State asserts that any error was cured. Fero replies that the evidence was not cumulative; the fact that the report was prepared by a defense investigator made it more damaging; and the judge's curative instruction came too late and did not remedy the prejudice caused by the cross-examination.

This claim of error is premised on an alleged violation of a state procedural rule. However, "federal habeas corpus relief does not lie for errors of state law.... In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (internal quotations and citations omitted); *Bowser,* 20 F.3d at 1065.

■ We are not persuaded that there was any constitutional error. In any event, the curative instruction by the trial judge remedied any error, as the New Mexico Su-

---

13. Katie Weber was a teacher at Fero's school with whom Fero was romantically involved.

preme Court concluded. *Fero I,* 105 N.M. at 345, 732 P.2d at 872 ("any possible prejudice to defendant was cured by the court's admonition.").

**C**

 The remaining claim of prosecutorial misconduct is that the prosecuting attorney improperly allowed the trial judge's son, Mr. Louis DePauli, Jr., to assist on the prosecution team. We consider this claim and all the circumstances relating to it below. *See* Part IV, *infra.* We there reject the claim of denial of due process which is premised in part on the employment of the judge's son. For those same reasons we hold that the alleged prosecutorial misconduct in employing Mr. DePauli, Jr. as a law clerk was not a denial of due process to Fero.

**D**

 Finally, citing *Floyd v. Meachum,* 907 F.2d 347 (2nd Cir.1990), Fero argues that the cumulative effect of the three instances of alleged prosecutorial misconduct, discussed above, deprived him of a fair trial. *See Floyd,* 907 F.2d at 357 (holding that "[w]hile each instance of prosecutorial misconduct, standing alone, might not justify reversal, the effect of all of them requires it.").

An en banc panel of this circuit has recently held that a cumulative-error analysis applies only where there are two or more actual errors. *United States v. Rivera,* 900 F.2d 1462, 1471 (10th Cir.1990) (en banc).

> [J]ust as harmless-error analysis is utilized only to determine whether actual *error* should be disregarded, a cumulative-error analysis aggregates only actual errors to determine their cumulative effect. Individual rulings frequently will have an adverse effect on a party, but unless that party can demonstrate that the ruling was an error, reversal would not be warranted. Impact alone, not traceable to error, cannot form the basis for reversal. The same principles apply to a cumulative-error anal-

ysis, and we therefore hold that a cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.

*Id.* at 1470–71 (citations omitted).

We noted, however, that "[t]he only possible exception is the holistic analysis conducted to determine whether the entire trial was so fundamentally unfair that defendant's due process rights were violated." *Id.* at 1471 n. 8. We are not persuaded that the circumstances presented by this record demonstrate a trial so fundamentally unfair that due process was denied.

In sum, we hold that the claims of prosecutorial misconduct must fail.

**IV**

**The Claim of Judicial Bias**

**A**

 With respect to Fero's judicial bias claim, the record reveals the following facts: Fero's criminal case was assigned to Judge Louis DePauli of New Mexico's Eleventh Judicial District on March 12, 1985. On June 3, 1985, two weeks before Fero's trial was scheduled to commence, Joseph Rich, a Gallup attorney who is Judge DePauli's brother-in-law, filed a four-million dollar wrongful death action against Fero on behalf of Hansen's family. Fero's criminal defense team learned of this on June 14, 1985, the Friday before trial. Moreover, during jury deliberations the defense learned that a prosecution law clerk—who had allegedly been introduced to the defense by the prosecution simply as "Louis"—was Louis DePauli, Jr., Judge DePauli's son.[14] Because of these circumstances, and the additional fact that Judge DePauli's wife was a nurse in the Gallup–McKinley school district and allegedly under the supervision of Hansen, the defense moved orally for the disqualification of Judge DePauli and later moved orally for a mistrial.[15] These motions were denied by the judge.

---

**14.** Having just completed his first year of law school, Louis DePauli, Jr. was employed during the summer of 1985 as a law clerk in the Gallup District Attorney's Office.

**15.** The oral motion to disqualify, based on the

Fero was convicted on June 20 and sentenced to life imprisonment by the judge on June 24, 1985. On July 19, 1985, Fero filed a post-trial motion for a new trial again claiming, *inter alia*, that Judge DePauli should have recused himself from Fero's criminal case.[16]

An evidentiary hearing on this motion was held on August 12, 1985. There Fero argued that he should be given a new trial, with a new judge, for any one of three reasons: (1) it was incumbent on either the court or the prosecution to inform the defense that the prosecution's law clerk was Judge DePauli's son and that Judge DePauli's brother-in-law was representing the Hansen family in the civil suit against Fero; (2) Judge DePauli should have recused himself *sua sponte* from Fero's criminal case; or (3) the prosecution had a "very strong duty," which it did not satisfy, to "insulate and isolate" the judge's son from Fero's case to ensure that he had absolutely no involvement in the case.[17]

At the hearing Judge DePauli's son testified that he had served as a law clerk in the Gallup District Attorney's office during the summer of 1985. He said that he had traveled to Truth or Consequences, New Mexico, with Steve Seeger, an assistant district attorney from the Gallup District Attorney's Office; he had roomed with him;[18] he had gone water skiing with him on Judge DePauli's boat during trial; and he had communicated with Seeger about Fero's case on a daily basis.[19] Mr. DePauli, Jr. also admitted that while in Truth or Consequences, he and Seeger had contact with Judge DePauli. According to Mr. DePauli, Jr., "[n]ow and then they would meet . . ., my dad, Mr. Seeger and the rest of my family would meet in the restaurant or in the lobby of the hotel since they were staying in the same place." The record does not, however, reveal the subject matter of any contacts these parties had.

While the defense alleged that the judge's son had worked extensively on Fero's case, researched "various critical issues, which became pivotal issues at the trial," and researched various issues for the prosecution throughout the trial, Louis DePauli, Jr. said that he had researched "one issue in particular" for the trial. When asked if he "did look at the other matters, such as jury instructions and so forth," he stated, "cursorily I did, yes." He also admitted having done some research for the jury instructions on what constitutes a mental deficiency.[20] Mr. DePauli, Jr. also said that he had worked "basically, exclusively" on the Fero case for the seven to ten days preceding the trial. With respect to the defense's intimation that the prosecution was trying to conceal Mr. DePauli, Jr.'s identity from the defense, the

---

fact that the judge's brother-in-law had filed the wrongful death action, was made the first day of trial, June 17, 1985. The oral motion for a mistrial, based on the participation on the prosecution team by the judge's son, was made on the last day of trial, June 20, 1985.

We have determined these dates after considerable effort in working with the State court audio tapes, which is all we have concerning much of the State proceedings. The difficulty and inadequacy of this type of record causes us serious concern about its reliability. This record has impeded and delayed this decision considerably. While this difficulty does not in this case produce a denial of due process in our judgment, this type of record is clearly undesirable and inferior to a transcribed record.

**16.** We note that the civil action filed by Judge DePauli's brother-in-law on behalf of Hansen's family against Fero, was also originally assigned to Judge DePauli. Judge DePauli, however, recused himself from that case.

**17.** The defense also noted that while it had been aware that Judge DePauli's wife was an employ-

ee in the Gallup–McKinley school district, it did not file a motion at the time it first got this information because it did not think it was a significant reason for recusal. However, when considered together with the fact that the judge's son had worked on Fero's prosecution team, and that the judge's brother-in-law was representing the Hansen family in the civil action, the defense believed there was ample evidence for disqualification.

**18.** The prosecution, the defense, and Judge DePauli and his son all stayed at the same hotel in Truth or Consequences.

**19.** Mr. DePauli, Jr. also admitted that he communicated "now and then" with Aragon at recesses during the trial and in the evenings. *See* August 12, 1985 Post-trial Motion Tape 1.

**20.** The defense also alleged in its motion papers that the judge's son had specifically assisted in the preparation of the prosecution's "brief in opposition to the submission of a voluntary manslaughter jury instruction". *See* State R. at 290.

judge's son testified that he believed he was introduced by the prosecution to the defense as follows: "this is Louis, he works for us." He did not remember if his last name was mentioned to the defense.

The judge denied Fero's post-trial motion from the bench on August 12 and by written order on September 12, 1985. Fero's conviction and sentence were affirmed by the New Mexico Supreme Court and the claim of error in denying recusal and a mistrial was rejected in that opinion. *Fero I,* 105 N.M. 339, 732 P.2d 866.[21] The court said:

> While we are mindful of the importance of protecting the right of every litigant to a fair and impartial tribunal, we nonetheless conclude that the circumstances and relationships surrounding this trial did not warrant the disqualification of Judge De-Pauli. Defense counsel explored this issue at the hearing on their motion for a new trial. The facts adduced at the hearing were that Louis, Jr. was never at counsel table and seldom even in the courtroom during the trial. He did not live with his father and no evidence emerged that he had any private conversations with his father or any meetings more frequent than had the defense or prosecution teams, all of whom were staying at the same inn as the judge. Fero fails to suggest any means, other than the mere fact of the son's employment, by which he might have influenced his father. Indeed, the fact that defense counsel did not recognize that the law student assisting the district attorney was the judge's son, until after the jury had retired tends to negate even the appearance of bias.

> Neither the judge's son nor his brother-in-law were "parties" to this case, nor did either possess an "interest" in the outcome

as this Court has elucidated that term in [prior cases].... We hold, therefore, that the trial judge did not abuse his discretion by declining to disqualify himself.

*Id.* at 343, 732 P.2d at 870. (citations omitted).

Fero also raised his judicial bias claim in his federal habeas petition, which he filed pro se. In the Magistrate's Proposed Findings and Recommended Disposition, the magistrate judge recommended the summary dismissal of three claims in Fero's petition, including the claim of judicial bias.[22] He did not, however, apprise Fero of the consequences of failing to object to the proposed findings and recommendations. We have since held that where a party appears without the benefit of counsel, we will "require magistrates within the circuit to inform a pro se litigant ... of the consequences of a failure to object, i.e. waiver of the right to appeal from a judgment of the district court based upon the findings and recommendations of the magistrate." *Moore v. United States,* 950 F.2d 656, 659 (10th Cir.1991); *accord Hardiman v. Reynolds,* 971 F.2d 500, 505 (10th Cir.1992).[23]

Although Fero did file, pro se, a response to the proposed findings in which he stated that he did not object to the summary dismissal of these claims, we decline to treat that response as a waiver. "A waiver is ordinarily an intentional relinquishment or abandonment of a *known* right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (emphasis added). Because the magistrate judge did not expressly inform Fero that failure to object to the proposed findings and recommendations would preclude appellate review, it has not been clearly established that

---

**21.** In Fero's docketing statement submitted October 2, 1985, to the New Mexico Supreme Court, Fero stated that Judge DePauli's son "either wrote, helped draft or researched the trial brief arguing against giving jury instructions for voluntary manslaughter and involuntary manslaughter; said instructions were requested by the defense and denied by the Court." State R. at 316.

**22.** The other claims for which the magistrate recommended summary dismissal were (1) that the trial court committed reversible error by re-

fusing to instruct the jury on voluntary and involuntary manslaughter, and (2) that the trial court erred in failing to instruct the jury that the state was seeking life in prison. Because we conclude that Fero did not waive his right to appellate review of these claims, we address the merits of these issues.

**23.** We note that neither the magistrate judge nor the district judge had the *Moore* or *Hardiman* opinions when their orders were entered.

Fero's response amounted to an intentional relinquishment of his right to appellate review. Thus, we address the merits of Fero's claim of judicial bias and later we discuss the merits of the other dismissed claims.

## B

■ The Supreme Court has said clearly:

A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.

*In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *see Staton v. Mayes,* 552 F.2d 908, 913 (10th Cir.), *cert. denied,* 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977). "[E]very procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Murchison,* 349 U.S. at 136, 75 S.Ct. at 625 (quoting *Tumey v. Ohio,* 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927)). Therefore, "[s]uch a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.... '[J]ustice must satisfy the appearance of justice.' *Offutt v. United States,* 348 U.S. 11, 14 [75 S.Ct. 11, 13, 99 L.Ed. 11 (1954) ]." *Murchison,* 349 U.S. at 136, 75 S.Ct. at 625.

In *Nichols v. Sullivan, supra,* this court noted that "[i]n general, the standard for evaluating whether a habeas petition alleges judicial bias amounting to a denial of due process is whether the judge was 'actually biased or prejudiced against the petitioner.'" 867 F.2d at 1254 (quoting *Dyas v. Lockhart,* 705 F.2d 993, 996 (8th Cir.) (*Dyas I* ), *cert. denied,* 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983)). However, we recognized that the Supreme Court has held that "the likelihood of bias or appearance of bias can, in certain circumstances, be so substantial as to create a conclusive presumption of actual bias." *Nichols,* 867 F.2d at 1254. We concluded that "[t]he test for assessing whether the likelihood of or appearance of bias is so great as to be constitutionally intolerable is whether 'the judge [is] unable to hold the balance between vindicating the interests of the court and the interests of the accused.'" *Id.* (quoting *Taylor v. Hayes,* 418 U.S. 488, 501, 94 S.Ct. 2697, 2704, 41 L.Ed.2d 897 (1974)). Thus, Fero may show judicial bias in one of two ways. First, he may demonstrate actual bias. *Murchison,* 349 U.S. at 136, 75 S.Ct. at 625 ("Fairness of course requires the absence of actual bias in the trial of a case."). Or, he may demonstrate that circumstances were such that an appearance of bias created a conclusive presumption of actual bias.

■ Fero does not appear to be claiming actual bias. He has not drawn our attention to any part of the record which reveals any alleged bias by Judge DePauli. Disqualification of a judge for actual bias or prejudice is a serious matter and should only be required when the evidence is compelling. *United States v. Balistrieri,* 779 F.2d 1191, 1202 (7th Cir.1985), *cert. denied sub nom. DiSalvo v. United States,* 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986). Because Fero points to no evidence of actual bias in the record, his claim of judicial bias must rest on there being an appearance of bias sufficient to override the presumption of honesty and integrity.

■ The Seventh Circuit recently considered when the appearance of bias rises to the level of a due process violation. *Del Vecchio v. Illinois Dept. of Corrections,* 31 F.3d 1363 (7th Cir.1994) (en banc).

When the Supreme Court talks about the "appearance of justice," it is not saying that bad appearances alone require disqualification; rather, it is saying that when a judge is faced with circumstances that present "some [actual] incentive to find one way or the other" or "a real possibility of bias," a court need not examine whether the judge actually was "biased."

*Id.* at 1372 (citations omitted). Without an incentive for actual bias, however, disqualification is not required regardless of appearances. *Id.* This is so because at some point a biasing influence becomes too remote and insubstantial to violate due process. *Aetna*

*Life Ins. Co. v. Lavoie,* 475 U.S. 813, 826, 106 S.Ct. 1580, 1588, 89 L.Ed.2d 823 (1986) (citing *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 243, 100 S.Ct. 1610, 1614, 64 L.Ed.2d 182 (1980)). As the Seventh Circuit recognized, "judges for the most part are presumptively capable of overcoming [biasing] influences and rendering evenhanded justice; and only a strong, direct interest in the outcome of a case is sufficient to overcome that presumption of evenhandedness." *Del Vecchio,* 31 F.3d at 1373. Our task is to determine whether the circumstances surrounding Fero's trial were such that the incentive to be biased was sufficiently strong to overcome the presumption of judicial integrity. We conclude they were not.

▮ Experience teaches that there are situations where the probability of actual bias on the part of the judge is too high to be constitutionally tolerable. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). "Among these cases are those in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticisms from the party before him." *Id.* (footnote omitted). However, "not '[a]ll questions of judicial qualification ... involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion.'" *Aetna,* 475 U.S. at 820, 106 S.Ct. at 1584 (quoting *Tumey,* 273 U.S. at 523, 47 S.Ct. at 441).

▮ Here the fact that Judge DePauli's brother-in-law had a substantial financial interest in the outcome of the civil action did not give rise to a direct, pecuniary interest on the judge's part sufficient to overcome the presumption of judicial integrity. It is true that a conviction in the criminal case could have enhanced the value of the civil suit for Judge DePauli's brother-in-law. However, the judge himself had no direct, pecuniary interest in that civil action. The judge stood to gain nothing personally from his brother-in-law's success in the civil action other than, perhaps, a feeling of pride and satisfaction in his brother-in-law's accomplishments. This interest is one of kinship not finance. Thus, the potential biasing influences, the involvement of the judge's son and brother-in-law in the criminal and civil cases, respectively, were matters of kinship only.

▮ In *Dyas I, supra,* the Eighth Circuit faced a fact situation somewhat similar to Fero's. The petitioner had been convicted of felony-murder before an Arkansas state trial judge whose nephew was the prosecuting attorney in the case, whose brother and son were the two deputy prosecuting attorneys in the case, and whose wife was the court reporter. *Dyas I,* 705 F.2d at 993; *Dyas v. Lockhart,* 771 F.2d 1144, 1146 (8th Cir.1985) (*Dyas II*). The Eighth Circuit concluded that the trial judge's relationship to the prosecuting attorneys, without more, was insufficient to create a conclusive presumption of actual bias. *Dyas I,* 705 F.2d at 997. The court noted that the judge had no personal interest in the outcome of the case and that the petitioner's sole basis for imputing bias was that Canon 3C(1)(d)(ii) of the Code of Judicial Conduct required disqualification. *Id.* The court stated that disqualification under the Code of Judicial Conduct did not necessarily imply impermissible bias under the Due Process Clause. *Id.*[24]

▮ We note that if disqualification under the Code of Judicial Conduct were deemed to imply impermissible bias under the Due Process Clause, then, in effect, the federal courts would be assuming supervisory control over issues of judicial disqualifica-

---

24. In *Dyas I* the Eighth Circuit remanded the case to the district court to determine whether the petitioner had waived the trial judge's offer to disqualify himself and, if not, to determine whether the judge exhibited any actual bias. On appeal after the hearing on remand, the Eighth Circuit again remanded, this time on the ground that the district court had failed to "fully discharge its obligation to conduct a hearing." *Dyas II,* 771 F.2d at 1146. On appeal after this second remand, the Eighth Circuit affirmed the district court's denial of habeas relief. *Dyas v. Lockhart,* 878 F.2d 1105 (8th Cir.1989).

We note that Fero has not requested a remand on the issue of actual bias. Furthermore, Fero raised the issue of judicial bias in his first posttrial motion for a new trial and had the benefit of an evidentiary hearing on that claim. Thus, unlike the petitioner in *Dyas,* Fero had the opportunity to litigate the issue of actual bias in state court. Therefore, a remand is unwarranted.

tion in the state courts. However, because federal courts hold no supervisory power over state judicial proceedings, *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982); *Bowser,* 20 F.3d at 1065, we will not read the disqualification requirements of the Code of Judicial Conduct into the Due Process Clause.

*Dyas* presented a more compelling case for disqualification than the case before us. In *Dyas,* the judge would have been required to rule on motions and objections and to consider legal arguments made by his nephew. Here, Judge DePauli's son was only a law clerk and did not appear in court other than as a spectator. Judge DePauli was not required to rule on motions or objections, nor to consider oral arguments made by his son, and there is no showing that his son was identified with any written submission to the judge. *Cf. Bradshaw v. McCotter,* 785 F.2d 1327 (5th Cir.), *modified on rehearing,* 796 F.2d 100 (5th Cir.1986) (a Texas Court of Criminal Appeals judge was required to recuse himself from an appeal in which his name appeared on the state's brief—the judge had been the Texas State Prosecuting Attorney—despite the fact that he had in no way participated in the prosecution of the case);[25] *but see id.* at 101–02 (Gee, J., concurring in the judgment) (judge not required to recuse himself). Therefore, the incentive for Judge DePauli to be biased in favor of the prosecution was less than that of the trial judge in *Dyas.* We find that any biasing influence from the circumstances here was too remote and insubstantial to create a presumption of bias.[26]

Nor is the involvement of Judge DePauli's brother-in-law as plaintiff's counsel in a wrongful death action against Fero a biasing influence sufficient to overcome the presumption of evenhandedness. Any interest Judge DePauli may have had in wishing to see his brother-in-law succeed is not the type of interest which would lead the average judge to fail to apply the proper criminal rules in Fero's trial, nor lead the average judge not to hold the balance nice, clear, and true between the state and the accused. *Tumey,* 273 U.S. at 532, 47 S.Ct. at 444. Even when coupled with the participation of Judge DePauli's son in the prosecution effort, there is not an actual incentive sufficient to lead the average judge to favor the prosecution.

In sum, Fero's due process right to a fair and impartial tribunal was not violated by the circumstances shown here.[27]

## V

### The Lesser Included Offense Claim

We next turn to the claim that the trial court's refusal to instruct the jury on the lesser included offenses of voluntary and involuntary manslaughter was a denial of due process. Fero contends that there was sufficient evidence to warrant the lesser included offense instruction.

Fero acknowledges that a panel of this court recently held that a state court's failure to submit a lesser included offense instruction cannot form the basis for federal habeas relief. *Lujan v. Tansy,* 2 F.3d 1031, 1036 (10th Cir.1993) ("[A] petitioner in a non-capital case is not entitled to habeas relief for the failure to give a lesser-included offense instruction 'even if in our view there was sufficient evidence to warrant the giving of an instruction on a lesser included offense.'") (quoting *Chavez v. Kerby,* 848 F.2d 1101, 1103 (10th Cir.1988)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1074, 127 L.Ed.2d 392 (1994).

**25.** On rehearing the Fifth Circuit, relying on dictum in *Aetna,* concluded that because the vote of the disqualified judge was not controlling, the petitioner could show no prejudice. *Bradshaw,* 796 F.2d 100, 101. The court therefore denied habeas relief. *Id.; but see Aetna,* 475 U.S. at 830–31, 106 S.Ct. at 1589–90 (Brennan, J., concurring) (whether judge's vote is controlling is irrelevant); *Aetna,* 475 U.S. at 831–33, 106 S.Ct. at 1590–91 (Blackmun, J., concurring in the judgment) (because collegial decisionmaking process in multimember court makes it impossible to know the actual effect of a biased judge, due process is violated whenever a biased judge sits on a case, regardless of the final vote count).

**26.** The record makes no showing whether Judge DePauli had any knowledge of the nature of his son's participation in the prosecution.

**27.** Though we find no due process violation, we feel constrained to observe that the avoidance of such circumstances would be advisable.

Nevertheless Fero seeks to preserve this issue for possible en banc review. It is by now, of course, beyond debate that "a three judge panel cannot disregard or overrule circuit precedent." *O'Driscoll v. Hercules Inc.*, 12 F.3d 176, 178 n. 1 (citation omitted), *petition for cert. filed*, 62 U.S.L.W. 3757 (U.S. Apr. 1, 1994) (No. 93–1728).

In light of *Lujan v. Tansy*, we reject this claim of error.

## VI

### Failure to Instruct About a Possible Life Sentence

▮ We turn to Fero's final claim of constitutional error. During voir dire, in response to a venireman's remark, the trial court informed the venire that the state was not seeking the death penalty. Because the trial judge also refused to instruct the jury that Fero nevertheless faced life imprisonment if convicted, Fero contends that he was denied due process. He argues that by failing to do so, the judge implied to the jury that the sentence Fero received was relevant and that he might not receive a heavy sentence if convicted. Consequently Fero says that the jury may have been willing to convict on weaker evidence. Because the jury did not know the heavy punishment Fero actually faced, he believes his due process rights were violated.

In the instant case the New Mexico Supreme Court held that it was proper under the circumstances for the trial court to inform the jury that the State was not seeking the death penalty. *See Fero I*, 732 P.2d at 873 (citing *State v. Martin*, 101 N.M. 595, 605, 686 P.2d 937, 947 (1984)) (noting that in capital offense cases it is proper for the trial court to inform the venire that the State is not seeking the death penalty). In *Martin*, the New Mexico Supreme Court noted, "[i]n a capital case it is proper for the state or court in the voir dire or in the court's opening or closing remarks to tell the jury that the state will not seek the death penalty." 101 N.M. at 605, 686 P.2d at 947 (quoting N.M.Stat.Ann.1978, UJI Crim. 50.06, Use Note (Repl.Pamp.1982)). Fero does not challenge the constitutionality of the New Mexico

statute. We must determine whether Fero was deprived of a fair trial by the trial judge's comment to the venire during voir dire.

The Supreme Court has held that "*[v]oir dire* is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Ristaino v. Ross*, 424 U.S. 589, 594, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976) (internal quotations and citations omitted). "The Constitution, after all, does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." *Morgan v. Illinois*, — U.S. —, —, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992) (citations omitted). Moreover, "[a]s a Federal Court we may find that the state court's application of state ... law violates due process, but we may not interfere with the state court's application of state law." *Springer v. Coleman*, 998 F.2d 320, 324 (5th Cir.1993); *see also Bowser*, 20 F.3d at 1065.

▮ Here we are not persuaded that the trial judge's instruction to the venire, pursuant to the rule adopted by the New Mexico Supreme Court, violated Fero's right to due process. It is constitutionally permissible to question the venire during voir dire about their attitudes concerning the death penalty in a case where the prosecution *is* seeking the death penalty. *See Lockhart v. McCree*, 476 U.S. 162, 170 n. 7, 106 S.Ct. 1758, 1763 n. 7, 90 L.Ed.2d 137 (1986) (noting that the state must be given the opportunity in a capital case to question prospective jurors during voir dire about their views on the death penalty); *Witherspoon v. Illinois*, 391 U.S. 510, 521–22, 522 n. 21, 88 S.Ct. 1770, 1776–77, n. 21, 20 L.Ed.2d 776 (1968) (recognizing implicitly that it is proper under the Constitution to ask prospective jurors about their attitudes toward the death penalty); *see also Morgan*, — U.S. at —, — —, 112 S.Ct. at 2226, 2232–33 (a trial court must upon a capital defendant's request inquire whether a potential juror would automatically impose the death penalty on the defendant's conviction, in order to assure that the defendant can intelligently exercise challenges for cause against venire members who would unwaiveringly impose a death penalty). In light of these principles, we feel

it equally acceptable for constitutional purposes that a venire be informed by the trial judge that the state is not seeking the death penalty. *See United States v. Steel,* 759 F.2d 706, 710–11 (9th Cir.1985) (federal district court did not abuse its discretion by informing the jury that the government was not seeking the death penalty); *State v. Hernandez,* 115 N.M. 6, 22, 846 P.2d 312, 328 (1993) (the trial judge did not err in observing that the state would not be seeking the death penalty).

■ We find no constitutional violation where a state court informs the venire that the state is not seeking the death penalty, while not informing the jury that the defendant will, if convicted, receive a sentence of life imprisonment. *See State v. Zimmerman,* 166 Ariz. 325, 329–30, 802 P.2d 1024, 1028–29 (Ct.App.1990) (a trial court did not commit error when it declined to inform the jury of the result of a not guilty by reason of insanity verdict, even though the jury had been informed that the state was not seeking the death penalty). *But cf. Simmons v. South Carolina,* — U.S. —, —, 114 S.Ct. 2187, 2190, 129 L.Ed.2d 133 (1994) (Blackmun, J., joined by Stevens, Souter, and Ginsburg, JJ.) (where defendant's future dangerousness is at issue and state law prohibits release on parole, due process requires that the sentencing jury be informed that the defendant is ineligible for parole); *id.* at — – —, 114 S.Ct. at 2200–01 (O'Connor, J., concurring in the judgment, joined by Rehnquist, C.J. and Kennedy, J.) (where the state seeks to show future dangerousness, defendant should be allowed to bring parole ineligibility to jury's attention through argument by counsel or instruction by the court).

We note that in *Clark v. Tansy,* — N.M. —, 882 P.2d 527 (1994), the New Mexico Supreme Court vacated a death sentence in light of *Simmons.* The court held:

The length of incarceration facing a capital defendant before he can be considered for parole, as an alternative to a death sentence, is information that must be provided to a jury before it deliberates on the capital charge *if* the defendant decides it is in his best interest to have the jury apprised of this information. To withhold this information after it is requested violates the petitioner's due process right to

have accurate information presented to the jury to rebut the prosecution's case for death.

*Clark,* at —, 882 P.2d at 533 (emphasis in original). Because the prosecution in *Clark* specifically relied on the defendant's future dangerousness in arguing for the death penalty, the defendant was entitled to have the jury fully informed as to the length of his incarceration under a life sentence. *Id.* at — – —, 882 P.2d at 533–34. We believe *Clark* addresses only death penalty cases, and we do not read it as affecting our decision.

We are not persuaded that any constitutional error occurred when the State trial judge here declined to inform the jury concerning the life sentence which Fero was facing, even though the jury had been informed that the State was not seeking the death penalty.

## VII

### Conclusion

In sum, we **GRANT** a certificate of probable cause to petitioner Fero. We hold that no constitutional error has been demonstrated in the state court conviction and sentence of Fero and the dismissal of his habeas petition is accordingly

**AFFIRMED.**