699 P.2d 115

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Larry BEACH, Defendant-Appellant.**

**No. 15452.**

Supreme Court of New Mexico.

April 23, 1985.

Janet Clow, Chief Public Defender, Susan Gibbs, Asst. Appellate Defender, Santa Fe, Bert Atkins, Dist. Public Defender, Alamogordo, for defendant-appellant.

Paul Bardacke, Atty. Gen., Elizabeth Major, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

RIORDAN, Justice.

Larry Beach (defendant) was convicted of the first-degree murder, by deliberate killing, of David Palaske (Palaske) and was sentenced to life imprisonment. Defendant appeals his conviction. We affirm.

**Issues.**

The issues on appeal are:

I. Whether the trial court erred in refusing to instruct the jury that diminished capacity is a defense to second-degree murder and voluntary manslaughter.

II. Whether the trial court erred in refusing to direct a verdict on first-degree murder by deliberate killing.

III. Whether the trial court erred in refusing to suppress evidence seized pursuant to a "nighttime search" of defendant's residence.

IV. Whether the prosecutor's questioning of defendant's former wife regarding a subject that had been ruled inadmissible by the trial court prejudiced the defendant and denied him a fair trial.

**Facts.**

On the evening of October 22, 1983, defendant was present at two different local bars in Alamogordo (Mr. A's and The Backdoor lounge). Palaske was present at The Backdoor lounge. During the course of the evening, defendant stated to at least five different people that he intended to kill Palaske. Around 9:30 p.m. that evening, defendant went to his home and armed himself with a knife and a rifle. Defendant placed the knife in his pocket and the rifle on the backseat floor of his car. He then returned to The Backdoor lounge and informed an acquaintance of his plan to "buddy-up" to Palaske and then to take Palaske to a secluded area and "take care of him." Defendant then went over to Palaske, shook his hand, and talked with him for a short while. Defendant and Palaske then left the bar together.

Defendant and Palaske drove to a place outside of the city, got out of the car and walked a short distance from the car. The two discussed defendant's former wife and some derogatory remarks that Palaske was supposedly making and writing about her. Angered by Palaske's flippant attitude regarding the remarks, defendant began to walk back toward the car. Palaske, while making derogatory remarks to defendant, followed. Once defendant reached the car, he pulled out the rifle, pointed it at Palaske (who was only a short distance from the car), closed his eyes, and fired. Palaske fell to the ground. Defendant, while still holding the rifle, walked around the front of the car and approached Palaske. Palaske was not dead and continued to make derogatory remarks to defendant. Defendant (now only three or four feet from Palaske) aimed the rifle at Palaske, closed his

eyes and fired. Defendant then sat on the car and waited for about twenty minutes, until Palaske had no pulse. Defendant then dragged Palaske's body into some bushes and walked back to the car, covering his tracks with a branch as he walked.

Defendant drove back into the city to The Backdoor lounge. He proceeded to tell, in turn, various individuals that he had killed Palaske and how he had done it. The following morning, defendant also told his roommate that he had killed Palaske.

■ Defendant was arrested for Palaske's murder during the early morning hours of October 24, 1983. After his indictment, defendant gave notice pursuant to NMSA 1978, Crim.P.Rule 35 (Cum.Supp. 1984), of his intent to plead as defenses insanity and inability to form the specific intent necessary to commit the crime charged (diminished capacity).

At trial, the court instructed the jury on the elements of first-degree murder, second-degree murder, voluntary manslaughter and involuntary manslaughter. The trial court gave defense instructions on insanity, mental illness and lack of specific intent for first-degree murder. However, the trial court refused to give defendant's requested instruction on lack of specific intent for second-degree murder and voluntary manslaughter. Defendant was convicted of first-degree murder.

## I. Diminished Capacity.[1]

Defendant argues that the trial court erred in refusing to instruct the jury on diminished capacity for second-degree murder and voluntary manslaughter and in refusing to allow defense counsel to argue during closing argument that second-degree murder is a specific intent crime. Defendant bases his argument on *State v. Doe*, 100 N.M. 481, 672 P.2d 654 (1983), in which this Court held that it was not reversible error for the trial court to have failed to give a general criminal intent instruction for second-degree murder. This

Court stated that the general criminal intent instruction was not required in that case because the elements of second-degree murder contained the "specific intent" requirement that a defendant know that his acts create a strong probability of death or great bodily harm. *Id.* at 484, 672 P.2d at 657.

Defendant contends that NMSA 1978, UJI Crim. 41.10 and 41.11 (Repl.Pamp. 1982), allow diminished capacity as a defense to a specific intent crime. *See State v. Padilla*, 66 N.M. 289, 347 P.2d 312 (1959). Defendant therefore asserts that under *Doe*, second-degree murder is now a "specific intent" crime, and he was thus entitled to a diminished capacity instruction for that crime. We disagree.

■ Under existing criminal uniform jury instructions, an instruction on diminished capacity is limited to willful and deliberate murder and to crimes that include an element of intent to do a further act or achieve a further consequence. UJI Crim. 41.10 and 41.11. This Court's decision in *Doe* does not alter these limitations for giving a diminished capacity instruction and was not intended to make second-degree murder a "specific intent" crime in the traditional sense.

■ The traditional definition of a "specific intent" crime has been described in the following manner:

When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a further consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.

1. Although the defendant raised the issue as diminished capacity, in New Mexico, since the adoption of Crim.P.Rule 35(e), it is raised as inability to form the specific intent required to commit a crime.

*State v. Bender,* 91 N.M. 670, 671, 579 P.2d 796, 797 (1978) (quoting *People v. Hood,* 1 Cal.3d 444, 456, 457, 82 Cal.Rptr. 618, 626, 462 P.2d 370, 378 (1969)). Second-degree murder and voluntary manslaughter, by statutory definition, do not contain an element of intent to do a further act or achieve a further consequence. NMSA 1978, §§ 30–2–1(B) and 30–2–3(A) (Repl. Pamp.1984). Those crimes contain only a knowledge element—the defendant's knowledge that his acts create a strong probability of death or great bodily harm.

██  Admittedly, the language used in *Doe* is confusing on this subject. We therefore take this opportunity to clarify our holding in *Doe.* In referring to second-degree murder as a "specific intent" crime, this Court was referring to the fact that second-degree murder, as defined in Section 30–2–1(B), now contains an element of subjective knowledge that does not *require* an added showing of general criminal intent (*i.e.,* conscious wrongdoing. *See State v. Sheets,* 94 N.M. 356, 610 P.2d 760 (Ct. App.), *cert. denied,* 94 N.M. 675, 615 P.2d 992 (1980)). *Compare State v. Omar-Muhammad,* 102 N.M. 274, 694 P.2d 922 (1985) (mental state of conscious wrongdoing required for vehicular homicide is not equivalent to the subjective knowledge required for depraved mind murder). The better wording in *Doe* would have been "specific knowledge" rather than "specific intent." Such knowledge is not an equivalent mental state to the intent to do a further act or achieve a further consequence, and a knowledge element does not always make a crime one of specific intent. *State v. Bender.* Under the current uniform jury instructions, it is intended that a diminished capacity defense instruction is available only for willful and deliberate murder and those crimes which include an element to do a further act or achieve a further consequence. Second-degree murder and voluntary manslaughter do not fall into either category, and this Court did not intend in *Doe* to change the existing elements for giving a diminished capacity instruction. We therefore determine that the trial court properly refused the tendered instruction.

## II. Refusal to Direct a Verdict.

As his second point on appeal, defendant argues that the trial court erred in denying defendant's motion for directed verdict on the issue of defendant's capacity to commit first-degree murder. Defendant also argues that the evidence of deliberate intent to kill is insufficient to support his conviction. We disagree.

██  Upon a review of the record, it is clear that there was conflicting evidence presented on the issue of defendant's sanity and ability to form the intent for first-degree murder. Two psychologists testified at a pretrial hearing that defendant was suffering from a brief psychotic episode at the time of the killing, but that his condition was of short duration. A person is not deemed legally insane unless his mental disorder is longstanding. *See State v. White,* 58 N.M. 324, 270 P.2d 727 (1954). The State's psychologist also testified that despite the fact that defendant was suffering from a psychotic episode at the time of the killing, defendant may still have been aware of what his actions were and the consequences of those actions. Further, there was lay testimony presented to the trial court that defendant appeared "normal" and "calm" both before and after the killing. The trial court found that the evidence of defendant's sanity at the time of the killing was sufficiently conflicting to go to the jury. Only where the trial court has clearly abused its discretion in allowing a case to go to the jury will this Court reverse on appeal. *State v. Dorsey,* 93 N.M. 607, 603 P.2d 717 (1979). There was no such abuse of discretion in the instant case, and the trial court's denial of defendant's motion for directed verdict was proper.

## III. Nighttime Search.

██  As his third point on appeal, defendant claims trial court error in refusing to suppress evidence seized from defendant's residence during a "nighttime search." Defendant argues that the affi-

davit in support of the search warrant failed to establish reasonable cause to justify the nighttime search. In *State v. Hausler*, 101 N.M. 143, 679 P.2d 811 (1984), this Court, in reversing the Court of Appeals, held that reasonable cause for a nighttime search does not have to appear on the face of the affidavit. Therefore, *Hausler* is controlling on this issue and the trial court properly denied defendant's motion to suppress.

## IV. Questioning by Prosecutor.

As his final point on appeal, defendant argues that he was denied a fair trial because of a question that was asked defendant's former wife by the prosecutor. We disagree.

Prior to trial, defendant filed a motion *in limine* to prevent the State from making any reference at trial to defendant's use of controlled substances or to a cocaine kit that had been seized from defendant's home. However, at a pretrial hearing, defendant admitted that since his use of controlled substances was part of the defense psychologist's opinion in the case regarding defendant's mental state at the time of the killing, that defendant's *use* of controlled substances was therefore relevant. Defendant maintained, however, that any references to defendant's *distribution* of controlled substances would be irrelevant and prejudicial.

The State argued that certain witnesses would testify that defendant feared that Palaske would "narc" him, and this testimony would be relevant to threats defendant had allegedly made against Palaske's life. The State admitted that it did not know whether this testimony would reveal that defendant's fear stemmed from his *use* of drugs or from defendant's *distribution* of drugs. The prosecutor stated that, except in the context of the threats defendant had made against Palaske, the State was not interested in introducing any allegations of defendant's drug distribution. The trial court ruled that any references to defendant's drug distribution were not probative and that the State should not "bring

it up." However, the court noted that its ruling did *not* apply to references to defendant's drug distribution in the context of threats allegedly made by defendant against Palaske.

At trial, on direct examination of defendant's former wife, the prosecutor asked about defendant's drug use. The prosecutor then asked if defendant "distributed those drugs to other people." The witness replied in the affirmative, and defendant simultaneously objected. After a bench conference, the trial court (on its own initiative) admonished the jury to disregard the witness' answer to the last question.

On appeal, defendant contends that the asking of the question by the prosecutor was highly prejudicial and that such prejudice was not cured by the court's admonition. We disagree.

In support of his argument, defendant primarily relies on *State v. Rowell*, 77 N.M. 124, 419 P.2d 966 (1966), in which this Court held that a question regarding a defendant's prior felony conviction constituted reversible error, despite the trial court's admonition to the jury. The court stated that the question had "no possible place in the trial. The purpose could have been nothing other than to arouse the prejudices of the jury against [defendant]." *Id.* at 126, 419 P.2d at 968.

■ Defendant equates *Rowell* with the instant case. However, we determine that *Rowell* is distinguishable. In the instant case, the prosecutor's question had a place in the trial. Arguably, the question may have been improper at that phase of the trial, but the question was likely to have been asked and the defendant's distribution of drugs inquired into at some point in the trial because of its possible relevance to earlier threats defendant allegedly made against Palaske. The earlier trial court ruling was that defendant's drug distribution would be relevant regarding these alleged threats. Thus, although the evidence regarding defendant's drug distribution might not have been proper at that point in the trial, we cannot say that it "had *no*

*possible place* in the trial." *Id.* (emphasis added). The prosecutor cannot be said to have acted in bad faith as a matter of law in asking the question when he did. Therefore, the prompt sustaining of defendant's objection and the admonition to the jury to disregard the answer cured any prejudicial effect. *State v. Simonson,* 100 N.M. 297, 669 P.2d 1092 (1983); *State v. King,* 90 N.M. 377, 563 P.2d 1170 (Ct.App.1977), *overruled on other grounds,* 98 N.M. 527, 650 P.2d 811 (1982).

Defendant's conviction for first-degree murder is affirmed.

IT IS SO ORDERED.

FEDERICI, C.J., and SOSA, Senior Justice, concur.