732 P.2d 866

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**O.C. "Chick" FERO, Defendant-Appellant.**

**No. 16088.**

Supreme Court of New Mexico.

Feb. 10, 1987.

Rehearing Denied Feb. 27, 1987.

Leon Taylor, Philip C. Gaddy, Tina Sibbitt, Albuquerque, for defendant-appellant.

Hal Stratton, Atty. Gen., Patricia Frieder, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

SOSA, Senior Justice.

Convicted by a jury of murder in the first degree and sentenced to life imprisonment, O.C. "Chick" Fero (Fero) appeals to this Court. We affirm the judgment and sentence of the trial court.

Fero raises five issues on appeal, which we will address in order. They are:

I.  Whether the trial judge committed reversible error by failing to disqualify himself;

II.  Whether the trial judge committed reversible error by refusing to instruct the jury on voluntary and involuntary manslaughter;

III.  Whether the trial judge committed reversible error by refusing to declare a mistrial, or suppress testimony, when the State had "lost" potentially exculpatory evidence;

IV.  Whether the trial judge should have granted a mistrial for prosecutorial misconduct; and

V.  Whether the trial judge should have instructed the jury that the State was seeking life imprisonment.

## FACTS

Fero was the principal of Tohatchi High School. The Superintendent of Schools for the Gallup-McKinley school system, which included Tohatchi, was Paul Hansen. Both men resided in the Tohatchi Teacherage, whose administration was also Fero's responsibility as principal. This arrangement evidently caused friction between the two men. By all accounts, Fero was extremely conscientious and hard working, a perfectionist. To some he even seemed obsessed with his duties, a man for whom his "job was his life and his life was his job."

After several postponements and cancellations, Hansen scheduled an evaluation of Fero's employment for the morning of February 22, 1985, at Hansen's office in Gallup. Witnesses testified that the day before the evaluation, Fero seemed to be depressed, disturbed, even suicidal. He had drafted a will, boxed his personal belongings and left his life insurance policy prominently on a chair in his office. That night Fero called a close friend and read to her several "goodbye" letters he had written to his parents and his daughter.

On the morning of the evaluation, Fero stopped by his school and told his assistant, Carl Montoya, "I won't be seeing you again." Then he drove into Gallup for his 9:00 a.m. appointment. Carrying his customary files and a portfolio, he appeared calm in casual conversation with witnesses in the central offices, before entering Hansen's office just after 9:00. At approximately 10:00 a.m., five shots rang out. Soon afterward, Fero came out calmly, in-

structed the secretary to call the police and told two other employees that everything was okay. These two men testified that he appeared "normal."

Proceeding down the hall, Fero entered the office of Hansen's assistant, Bud Hendrickson, and handed him his school keys. He then called Montoya, told him that he had shot Hansen, and referred to some papers he had left for Montoya. Next he went into Hendrickson's inner office and sat down, calmly informing Hendrickson that he had shot Hansen because of his insistence on negative criticism and his refusal to appreciate the positive aspects of Fero's performance as principal. Fero handed Hendrickson his portfolio with the gun in it. He was arrested and gave a statement to the police.

In it, Fero stated that Hansen ridiculed and threatened him, fired him, and then offered a handshake with the words, "This is not personal." Fero started to stand up to leave, he recounted, at which point the gun fell out of his portfolio onto his lap. The next thing he remembered was seeing Hansen lying on the floor, then bending down to touch him. Fero explained how the gun had ended up in his portfolio after he and a teacher had been searching for a prowler around the Teacherage a few days earlier.

At trial, the defense requested and received an instruction on second degree murder based on mental illness. The court, however, denied defense requests for instructions on voluntary and involuntary manslaughter. The jury found Fero guilty of first degree murder, for which the court imposed a sentence of life imprisonment. This appeal followed.

## I. Disqualification of the Trial Judge

Fero cites constitutional and ethical concerns which, he argues, should have mandated the disqualification of Judge DePauli. These concerns are predicated upon two [1] sets of factual circumstances: First, just before this trial began, the Hansen

estate and family filed a wrongful death action against Fero. That case was also assigned to Judge DePauli. The plaintiffs were represented by Joseph L. Rich, Esq., the judge's brother-in-law. Second, during trial the district attorney employed as a law clerk a young man named Louis, who turned out to be the judge's son. Upon discovering these relationships, the defense moved to disqualify the judge and for a mistrial. The court denied the motions. The defense raised the issue again in connection with its motion for a new trial, which the court also denied.

■ Fero contends, quite correctly, that the New Mexico Constitution, Article VI, Section 18, requires recusal in any case in which the judge is related to "either of the parties ... or in which he has an interest." As this Court held in *Tharp v. Massengill*, 38 N.M. 58, 70, 28 P.2d 502, 509 (1933), the term "parties" can include an attorney who has an interest in a contingent fee. We agree, therefore, that it would be improper for Judge DePauli to hear a civil case where plaintiffs are represented by his brother-in-law. Indeed, the judge had disqualified himself from the civil case prior to the hearing on Fero's motions.

We cannot follow Fero, though, in the further leap he would have us make, namely that the judge had an "interest" in the civil case because he would have liked to see his brother-in-law succeed. Nor can we impute such an "interest" to the criminal proceeding on appeal here.

■ As for the judge's son, there is no evidence on the record to indicate that the son ever acted as a lawyer or appeared before the court, only that he did some legal research. In no way can his employment status as a law clerk be stretched to make him a "party" in the constitutional sense. *Id.* at 71, 28 P.2d at 509. Nevertheless, Fero argues that due process of law was denied him by the possibility of bias created by the filial relationship with an

---

1. Fero further adds that the judge's wife was a nurse in the Gallup school system, superin-

tended by Hansen. Fero does not explain, and we fail to see the significance of this fact.

employee of one party, citing *State ex rel. Hannah v. Armijo*, 38 N.M. 73, 28 P.2d 511 (1933). This argument also implicates the "appearance of impropriety" standard found in the Code of Judicial Conduct. *See* SCRA 1986, 21–200.

While we are mindful of the importance of protecting the right of every litigant to a fair and impartial tribunal, we nonetheless conclude that the circumstances and relationships surrounding this trial did not warrant the disqualification of Judge DePauli. Defense counsel explored this issue at the hearing on their motion for a new trial. The facts adduced at the hearing were that Louis, Jr. was never at counsel table and seldom even in the courtroom during the trial. He did not live with his father and no evidence emerged that he had any private conversations with his father or any meetings more frequent than had the defense or prosecution teams, all of whom were staying at the same inn as the judge. Fero fails to suggest any means, other than the mere fact of the son's employment, by which he might have influenced his father. Indeed, the fact that defense counsel did not recognize that the law student assisting the district attorney was the judge's son, until the jury had retired, tends to negate even the appearance of bias.

Neither the judge's son nor his brother-in-law were "parties" to this case, nor did either possess an "interest" in the outcome as this Court has elucidated that term in *State ex rel. Anaya v. Scarborough*, 75 N.M. 702, 705, 410 P.2d 732, 734 (1966). *See also State ex rel. Gesswein v. Galvan*, 100 N.M. 769, 770, 676 P.2d 1334, 1335 (1984). We hold, therefore, that the trial judge did not abuse his discretion by declining to disqualify himself. *See Martinez v. Carmona*, 95 N.M. 545, 550, 624 P.2d 54, 59 (Ct.App.), *cert. quashed* 95 N.M. 593, 624 P.2d 535 (1981).

## II. Manslaughter Instructions

■ On this point, Fero first contends that the trial court committed reversible error by failing to instruct the jury on voluntary manslaughter as a lesser included offense. There is no doubt that a defendant is entitled to such an instruction "if there is evidence to support, or tending to support, such an instruction." *Jackson v. State*, 100 N.M. 487, 490, 672 P.2d 660, 663 (1983) (citing *Sells v. State*, 98 N.M. 786, 653 P.2d 162 (1982)).

The instruction defendant requested explains that "[t]he difference between second degree murder and voluntary manslaughter is sufficient provocation." NMSA 1978, UJI Crim. 2.20 (Repl.Pamp. 1982). This instruction leads to another which defines "sufficient provocation": "The provocation must be such as would affect the ability to reason and to cause a temporary loss of self control in an ordinary person of average disposition." NMSA 1978, UJI Crim. 2.22 (Repl.Pamp. 1982). *Sells v. State*, upon which Fero so heavily relies, does not alter this requirement, although it does hold that informational words can constitute sufficient provocation, in some factual contexts.

Fero does not offer evidentiary support for his assertion that it should have been for the jury to decide whether Hansen's conduct during the evaluation would have provoked "an ordinary person of average disposition."[2] Because Fero might have been, subjectively, out of control, he was entitled to, and received, an instruction on inability to form a deliberate intention to kill. NMSA 1978, UJI Crim. 41.10 (Repl. Pamp.1982). In fact, Fero's expert testified that Fero's reaction to criticism and stress was out of proportion and exaggerated. The record, however, indicates that, objectively, the provocation was not sufficient.

■ Finally, the general rule is that "[t]he exercise of a legal right, no matter how offensive, is no such provocation as

2. We note that the only account of Hansen's words and actions comes from the statement of Fero himself. Yet, that statement yields not a single specific fact from which provocation could be inferred.

lowers the grade of homicide." *State v. Manus*, 93 N.M. 95, 100, 597 P.2d 280, 285 (1979) (citations omitted), *overruled on other grounds in Sells v. State*, 98 N.M. 786, 653 P.2d 162. Hansen had, not just a legal right, but a public duty to evaluate Fero's employment; in the exercise of that duty he was privileged to criticize and to fire Fero. Fero furnishes no facts or circumstances to indicate how Hansen's performance of his public duty was so egregious that this Court should abandon the rule laid down in *State v. Manus*.

From the foregoing, we conclude that Fero failed to demonstrate the existence of evidence which would support the giving of an instruction on voluntary manslaughter.

■ Second, Fero claims that the jury should have been instructed on involuntary manslaughter, because he introduced evidence that the killing was committed without "knowledge" of what he was doing. This argument rests on a misreading of our opinion in *State v. Beach*, 102 N.M. 642, 699 P.2d 115 (1985). That case simply clarified the concept that the crime of second degree murder does not require "specific intent" as an element, though it does require a mental state of "specific knowledge." Indeed, this Court expressly held that the instruction on diminished capacity could not extend to reduce a charge of second degree murder. *Id.* at 645, 699 P.2d at 118. There are two further flaws in Fero's position, moreover.

The first is that the evidence does not support Fero's contention that he did not "know" that his acts created a strong probability of death or great bodily harm, which knowledge is required for second degree murder. If such evidence had existed, Fero would have been entitled to an instruction on insanity, not on manslaughter. *See* NMSA 1978 UJI Crim. 41.01 (Repl. Pamp.1982). Second, the instruction Fero did request was for involuntary manslaughter resulting from an unlawful act, not a felony. NMSA 1978, UJI Crim. 2.30

(Repl.Pamp.1982). The facts simply do not appear to fit this definition, nor does Fero convince this Court that they might fit.

We conclude that the trial court correctly refused Fero's requested instructions on manslaughter.

### III. Loss of Evidence

■ At trial the State called as a witness Dr. John Smialeck, who testified to the cause of death. Over objection, Dr. Smialeck gave his opinion that Fero first fired four non-fatal shots, then walked around Hansen's prone body and fired a fatal shot to the back of Hansen's head. The doctor's opinion rested on a comparison of bullet trajectories in the body with the position of the recovered bullets and on a photograph of the body lying on the floor with a pool of blood beneath the head.

At some point, the police removed pieces ["the size of a medium pizza"] of the carpet on which they had found the body. These pieces were "lost" a few days before trial and "found" again after the motion for a new trial.[3] The defense had seen the carpet and had made informal requests for its production, but "decided not to press the issue" when apprised of the loss.

Dr. Smialeck himself never saw the samples of carpet and did not refer to them in his testimony. Nevertheless, Fero contends that the loss of the carpet deprived him of the opportunity for effective cross-examination. When the trial court denied the defense motion to suppress Smialeck's testimony, the resulting prejudice to Fero's constitutional right of confrontation required a mistrial, the argument concludes.

We reject this argument as meritless. Fero correctly cites this Court to the standards we established in *State v. Chouinard*, 96 N.M. 658, 634 P.2d 680 (1981) *cert. denied*, 456 U.S. 930, 102 S.Ct. 1980, 72 L.Ed.2d 447 (1982). There we held that reversible error only results when the "lost" evidence is material and its absence

---

**3.** These same pieces of carpet provided the occasion for Fero to move for a new trial on the basis of newly discovered evidence, while this appeal was pending. We denied the motion to remand to the district court for an evidentiary hearing on the question at that time.

prejudicial to the defendant. *Id.* at 662, 634 P.2d at 684. The determination of materiality and prejudice is, like other evidentiary rulings, discretionary with the trial court, and the importance of the lost evidence depends on many factors, including the weight of the other evidence and the opportunity to cross-examine. *Id.* at 663, 634 P.2d at 685.

In the case at bar, the defense declined the option of putting the witness back on the stand to explore the relevance of the missing evidence through cross-examination. Even now Fero has failed to suggest how he might have used the carpet pieces convincingly, since Smialeck spoke only of the wounds themselves and of the final resting position of the body, all of which testimony was uncontroverted. In light of all the evidence, we hold that the trial court did not err in refusing to suppress the testimony of Dr. Smialeck and in denying the motion for mistrial.

### IV. Prosecutorial Misconduct

■ Fero directs our attention to three acts by the prosecution, each and all of which, he asserts, require reversal. The first was an exhortation during closing argument to "give justice to Mrs. Paul Hansen and her young son who have stayed in the courtroom the past four days." Defense counsel objected, but did not then ask for a curative admonition, much less a mistrial.

The remark was clearly improper, but by itself does not rise to the level of due process violation claimed by Fero. Our case law countenances a reasonable latitude on both sides during closing arguments. *State v. Pace,* 80 N.M. 364, 371, 456 P.2d 197, 204 (1969). Ultimately, the question is whether the prosecutorial excess deprived defendant of a fair trial. *State v. White,* 101 N.M. 310, 314, 681 P.2d 736, 740 (Ct.App.), *cert. denied,* 101 N.M. 189, 679 P.2d 1287 (1984). We conclude that this one remark by the prosecutor did not deprive the defendant of a fair trial.

■ The second act challenged by Fero concerns the conduct of the prosecutor in cross-examining Carol Shiffley, Fero's friend and co-worker. The witness was asked to read silently a transcript of a statement prepared by a defense investigator after he had interviewed her. Although she agreed with most of the statement, she disputed some portions of it. The prosecutor asked her to read aloud the portions with which she disagreed. Over objection, she recited a damaging anecdote. Defense counsel requested a mistrial, which was denied. He then asked for an admonition, which the trial court gave, instructing the jury to disregard the statement because the witness had denied ever making it. We disagree with Fero that the prosecutor acted in bad faith by asking the witness to explain how she disagreed with the transcript of a statement previously made to an investigator for the defense. The prosecutor did not use the discrepancy to impeach the credibility of the witness. Moreover, any possible prejudice to defendant was cured by the court's admonition. *See State v. Simonson,* 100 N.M. 297, 301, 669 P.2d 1092, 1096 (1983).

■ Finally, Fero raises again the issue of Judge DePauli's son, asserting that the district attorney acted improperly by assigning the son to this case and attempting to conceal from the defense his relationship to the judge. As discussed above, if young DePauli had been acting as a lawyer, prejudice would be presumed. We take judicial notice of the facts that clerking for a district attorney provides practical and honorable learning for a law student and that there is only one judge sitting in McKinley County. Nothing in the nature of the legal research performed by the son was impermissible or suggestive of undue influence. Furthermore, Fero furnishes no facts of record which prove that the prosecutor consciously or deliberately concealed the son's identity.

We conclude that neither individually nor collectively do the acts of the prosecutor amount to the kind of misconduct that mandates a mistrial.

### V. Jury Instruction on Life Imprisonment

 On voir dire the court properly responded to a venireman's remark by informing the jury panel that the State was not seeking the death penalty. This Court expressly endorsed giving such information in *State v. Martin*, 101 N.M. 595, 605, 686 P.2d 937, 947 (1984). As the 1982 Use Note indicates, this is the only exception to the standard rule that the jury is not to concern itself with the consequences of its verdict. NMSA 1978, UJI Crim. 50.06 (Repl.Pamp.1982).

Fero suggests that it would have been "fair" to inform the jury that the State was seeking a sentence of life imprisonment. If such "fairness" were extended, the exception above would swallow the rule. Consequently, we reject Fero's suggestion.

For the foregoing reasons, the judgment of the trial court is affirmed.

IT IS SO ORDERED.

SCARBOROUGH, C.J., and STOWERS, J., concur.