The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date:** December 4, 2023

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.                                       **NO. S-1-SC-39211**

**MARK TIMOTHY HICE,**

    Defendant-Appellant.

**CAPITAL APPEAL**
**Maria Sanchez-Gagne, District Judge**

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Van Snow, Assistant Attorney General
Albuquerque, NM

for Appellee

## DECISION

**BACON, Chief Justice.**

{1}    This matter comes before the Court through Defendant Mark Hice's direct appeal of convictions he received in relation to two separate shootings that resulted in multiple injuries and one death. Pertinent to this appeal, a jury convicted Defendant of first-degree murder, three counts of shooting at or from a motor vehicle

resulting in bodily injury, and four counts of shooting at or from a motor vehicle without bodily injury. Defendant argues that the district court erred by denying several of his requested jury instructions, that the New Mexico Constitution requires juror unanimity for the specific theory of first-degree murder upon which a defendant is convicted, and that his four convictions for shooting at or from a motor vehicle violate double jeopardy. We affirm the district court. Because these issues have been previously decided, we dispose of this case by nonprecedential decision. Rule 12-405(B)(1) NMRA.

## I. BACKGROUND

### A. Factual Summary

{2}     Defendant and his former friend, Louie Martinez, had a dispute over a loan and a gun used as collateral for the loan. Their relationship became "toxic," and their other friends became involved. Defendant received a call from Louie weeks after the dispute began: when he answered, he heard guns cocking in the background. He and Louie began arguing. Defendant claimed that Louie's friend, Angelica, called him and threatened to kill Defendant and his family. Additionally, Angelica posted a photo to Snapchat of herself holding an AR-15, with the caption "Mark hice is a punk ass bitch !! come to the trap pussy [two squirt gun emojis]." Defendant also made threats on social media and posted a photo of himself on social media with two

guns pointed towards the camera with the caption "Fuck around & get shot boiiii [upside-down smiley face emoji]."

{3}     Defendant testified that he felt "paranoid" about the situation with Louie. Two days before the incidents at issue, Defendant acquired two .45 caliber handguns. Defendant testified that for protection from Louie and his friends, he bought a Glock and received a Colt 1911 as a gift. The same day, Defendant exchanged messages with his friends and told one that he was "finna tale some bodies tonight" and anticipated getting into a shootout with Louie. The next day, Defendant received another gun back from a friend and loaded his guns.

**1.      Shooting incident 1 - the Abeytas**

{4}     On October 4, 2018, the day of the shootings, Defendant spent time with his girlfriend, Brittany Garcia. The two were driving together after having lunch and noticed a black Escalade following them. Defendant believed that Louie and his friends were in the Escalade, but did not originally think they were armed. However, when the Escalade passed Defendant's vehicle, Louie and his friends flashed guns at Defendant and made "gun gestures" at him. Brittany also confirmed that the occupants of the Escalade seemed to be threatening Defendant. After the Escalade continued to follow Defendant, he "had a feeling" that the occupants were going to begin shooting at him. He noticed the sunroof on the Escalade go up and grabbed

his gun. Then Defendant heard two pops and Brittany started to scream. Defendant testified that he tried to drive faster but then heard another three pops. Defendant rolled down his window and fired at the ground, and then he took off without seeing if the Escalade was still following him.

{5}     During this time, William and Mary Abeyta and their two grandsons were driving home in William's blue Ford F-150. At the time of the gunfire, their vehicle was between Defendant's car and the Escalade. They heard the shots and saw the muzzle flashes. William swerved to avoid being struck. The grandchildren were scared and shocked during the incident, and the Abeytas had to reassure them that everything would be okay. The Abeytas testified to believing "something was going on" between the Escalade and Defendant, but did not hear any gunshots coming from the Escalade.

**2.     Shooting incident 2 - the Subaru**

{6}     Witnesses testified that after the first shooting, Defendant and Brittany went to their friend Savannah Martinez's house and smoked marijuana together. Defendant texted his friend, Axel Zammarron, and asked if he was "down to go and solve some problems with Louie." Defendant bought more ammunition from Big Five. The two then purchased more marijuana and went back to Savannah's house to smoke. Defendant and Anton then went to an apartment to meet up with friends,

where the two did cocaine, drank Fireball, and smoked marijuana. That evening, Defendant met up with some of his friends at a park, including Brittany, Savannah, Axel, Anton, Katrina, and Alejandra. Defendant was armed with an "uzi" and had given a Colt .45 to Anton and a Glock to Axel for protection. Defendant and his group of friends ended up leaving the park in two separate vehicles because Defendant thought a mutual friend was trying to set him up.

{7}     Brittany drove a white Kia Optima with Savannah in the front passenger seat. Defendant sat behind Brittany, and Anton sat behind Savannah. Alejandra drove the second car, a Nissan, with Axel in the front passenger seat and Katrina in the back seat. It was around 8 p.m. and was dark outside. The two cars followed each other, with the Kia in front. The occupants of both vehicles testified somewhat consistently regarding the following events. The occupants in the Kia watched a blue Subaru with bright headlights quickly approach them from behind, cutting off Alejandra's Nissan. The driver of the Subaru was allegedly driving erratically, honking its horn and flashing its headlights. The driver of the Subaru disputed this, and claimed that the Kia kept braking in front of her. Defendant and Anton wondered who was driving the Subaru and kept looking at the vehicle to determine the identity of its occupants.

{8}     Anton told Brittany to run a red light in order to determine if the Subaru was truly following them. The Kia, Nissan, and Subaru all ran the red light. Defendant

claims that "everyone" thought Louie was in the Subaru. However, Brittany testified that she and Savannah told Defendant to calm down. Anton testified that he told Defendant he did not think it was Louie because he did not recognize the headlights. Axel testified that he was asleep when this incident began but that he woke up when Defendant called Alejandra. Defendant feared that Louie and/or his friends were following them, but Axel told Defendant that he did not think this was the case. Axel testified that he fell back to sleep after speaking with Defendant.

{9}     Defendant loaded his firearm, anticipating a shoot-out between his friends and the individuals in the Subaru. The Subaru went to pass the Kia, and that is when the gunshots began. It is unclear who fired the first shot. Defendant testified that Axel shot first from the Nissan, and Anton testified that Defendant shot first. Axel also testified that he was asleep when the gunfire began and that he could not have fired the first shot. Defendant, Axel, and Anton fired over twenty times into the Subaru. Defendant testified that once he stopped shooting, he realized that no one from the Subaru was shooting back at him.

{10}     Louie was not in the Subaru; instead, there were four teenagers inside who had nothing to do with the ongoing dispute between Defendant and Louie: Angelyssa Montoya, the driver; Monica Cordova; Rudy Trujillo; and Cameron Martinez. Three of the occupants were injured, and Cameron lost his life after being shot in the head.

6

### 3. Aftermath of the shootings

{11}    Defendant was charged with several crimes relating to both shootings. At trial, Defendant requested a self-defense instruction in relation to the first shooting incident. He also requested provocation and mistake-of-fact instructions for the second shooting incident that caused Cameron's death. A jury convicted Defendant on all counts, as discussed above.

## II.    ANALYSIS

{12}    Relevant to several of Defendant's claims discussed herein, the denial of a jury instruction is a mixed question of law and fact that we review de novo. *State v. Swick*, 2012-NMSC-018, ¶ 60, 279 P.3d 747. "A defendant is entitled to an instruction on a theory of the case where the evidence supports the theory." *State v. Sloan*, 2019-NMSC-019, ¶ 61, 453 P.3d 401 (internal quotation marks and citation omitted).

### A.    The District Court Did Not Err in Denying Defendant's Provocation Instruction Relating to the Subaru Shooting

{13}    Defendant argues that the district court erred in denying his requested provocation instruction in relation to his murder charge. The State raises questions regarding preservation of this issue because, although Defendant did tender a provocation instruction, he did not tender a manslaughter instruction. Defendant argues that counsel alerted the district court that he sought a voluntary manslaughter

7

instruction through the request for a provocation instruction because the lesser offense of second-degree murder is manslaughter under a jury finding of provocation.

{14}    We agree that Defendant sufficiently alerted the district court of his intention to obtain a manslaughter instruction because "[t]he critical difference between murder and voluntary manslaughter is the existence of legally sufficient provocation." *State v. Munoz*, 1992-NMCA-004, ¶ 5, 113 N.M. 489, 827 P.2d 1303. Moreover, "if the record reflects that the judge clearly understood the type of instruction the defendant wanted and understood the tendered instruction needed to be modified to correctly state the law, then the issue is deemed preserved for appellate review." *State v. Jernigan*, 2006-NMSC-003, ¶ 10, 139 N.M. 1, 127 P.2d 537. Defense counsel expressly stated that Defendant might be convicted of a "step down" from second-degree murder if the jury found sufficient provocation existed. The district court judge expressly ruled on provocation. This demonstrates that the district court adequately understood Defendant's request. *See id*. Thus, Defendant's failure to specifically proffer a manslaughter instruction is not fatal for his claim here. For reasons explained below, however, we hold that the district court did not err in declining to issue the instruction.

{15} Defendant presented evidence that the Subaru drove erratically; however, the murder victim was not the driver of the vehicle. This Court recently affirmed that "[i]t is settled law that the victim [of voluntary manslaughter] must be the source of the provocation," when the defendant's accomplice was the alleged source of the provocation. *Sloan*, 2019-NMSC-019, ¶ 61 (internal quotation marks and citation omitted). Accordingly, "[t]he proper inquiry is whether sufficient evidence was introduced to support a determination that the victim individually provoked the defendant." *Id.* Here, there was no evidence presented that Cameron provoked Defendant in any way. Accepting Defendant's testimony as truthful, the fact that Axel provoked Defendant by shooting first does not entitle Defendant to a provocation instruction under *Sloan*. *See* 2019-NMSC-019, ¶ 61.

{16} Even if Cameron had been driving the vehicle, evidence that a car is driving erratically, without more, is insufficient to support a provocation instruction. "Sufficient provocation is defined as 'any action, conduct, or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions.'" *Jernigan*, 2006-NMSC-003, ¶ 24 (quoting UJI 14-222 NMRA). "The provocation must be such as would affect the ability to reason and to cause a temporary loss of self control in an ordinary person of average disposition." *Id.* An appellate court is tasked with determining "whether the jury could have determined that [the]

defendant's actions were the result of legally sufficient provocation based on the evidence presented." *Munoz*, 1992-NMCA-004, ¶ 6 (internal quotation marks and citation omitted). Because our caselaw requires us to consider whether an "ordinary individual with an average disposition" could have reasonably been provoked under the circumstances, Defendant's heightened fear and intoxication, to the extent that those factors influenced Defendant's actions, are not relevant to our analysis. As a result, this Court is essentially left with the question of whether alleged erratic driving may constitute provocation. We acknowledge that "[w]hether a particular set of circumstances is sufficient provocation is generally a question for the jury to decide." *State v. Gaitan*, 2002-NMSC-007, ¶ 35, 131 P.3d 758, 42 P.3d 1207 (internal quotation marks omitted). However, erratic driving, without more, cannot reasonably constitute sufficient provocation as a matter of law. *See, e.g.*, *id.* ¶ 13 (determining that a provocation instruction was not warranted where the defendant instigated an assault and relied on victim's response as the source of provocation); *State v. Stills*, 1998-NMSC-009, ¶ 35, 125 N.M. 66, 957 P.2d 51 (agreeing that victim's words and act of pushing the defendant were insufficient to warrant a provocation instruction); *State v. Fero*, 1987-NMSC-008, ¶¶ 15-19, 105 N.M. 339, 732 P.2d 866 (concluding that the defendant was not entitled to a manslaughter instruction when a superintendent ridiculed him, threatened him, and fired him).

Accordingly, we affirm the district court's denial of Defendant's requested provocation instruction.

**B.** **The District Court Did Not Err in Denying Defendant's Mistake-of-Fact Instruction Relating to the Shooting of Cameron Martinez**

{17} Defendant argues that he reasonably believed that Louie was in the Subaru during the time of the shooting that resulted in the death of Cameron Martinez. Accordingly, Defendant requested the following instruction.

> At issue in this case is whether the defendant believed that Louie Martinez was in the blue Subaru. The burden is on the state to prove beyond a reasonable doubt that the defendant did not have an honest and reasonable belief in the existence of those facts at the time of the alleged conduct. If you have a reasonable doubt as to whether the defendant's alleged conduct resulted from a reasonable belief in those facts, you must find the defendant not guilty.

The district court denied Defendant's requested mistake-of-fact instruction and explained that the mistake-of-fact instruction was not appropriate because depraved-mind murder requires an act greatly dangerous to others. Defendant argues that "[i]f Mark believed Louie was in the car and acted out of fear (in combination with the above discussed provocation instruction), then he did not commit depraved[-]mind murder. If acting out of provocation, then the State cannot prove malice." On the other hand, the State contends that "[i]f Louie had been in the car and Defendant shot him, it would still have been a murder because he intended to kill him. Defendant's intent to kill Louie would have transferred to his actual victim,

Cameron." Thus, the State argues that if the jury "believed that [Defendant] unintentionally killed Cameron because he acted with a depraved mind by shooting wildly into the Subaru without knowing who was in it, it would have convicted him of first[-]degree murder" under the depraved-mind murder theory. Alternatively, "[i]f [the jury] believed that [Defendant] was intentionally trying to kill Louie, it would have transferred the intent to Cameron and convicted him of" willful-and-deliberate first-degree murder.

{18} "Mistake of fact is a defense where the existence of a mental state is essential to the crime charged." *State v. Contreras*, 2007-NMCA-119, ¶ 15, 142 N.M. 518, 167 P.3d 966. As explained by the State's arguments and the district court, Defendant's belief that Louie was in the Subaru does not negate the mental state required to support the jury's conviction. Whether Defendant reasonably believed Louie was in the Subaru or not, the jury could have found him guilty of first-degree murder based on recklessly shooting into a vehicle without knowing who was inside. Additionally, Defendant's argument requires this Court's reversal of the district court's ruling on his provocation instruction. Because this case does not warrant a provocation instruction, and the mistake-of-fact instruction does not negate the required mental state required for Defendant's murder conviction, the district court did not err in refusing to give Defendant the proposed instruction.

**{19}** Finally, even though the parties do not address this aspect, a mistake of fact must be reasonable. *Id.* Here, there was no evidence presented that Louie drove a car similar to the Subaru, that an individual in the Subaru resembled Louie or his friends, or that Defendant even saw who was in the Subaru. Accordingly, no evidence existed to prove that Defendant reasonably believed he was shooting at Louie. We affirm the district court's denial of the mistake-of-fact instruction.

**C. Denying Defendant's Provocation and Mistake-of-Fact Instruction Does Not Constitute Cumulative Error**

**{20}** "Where there is no error to accumulate, there can be no cumulative error." *State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328 (alteration, internal quotation marks, and citation omitted). Because we conclude that the district court did not err denying either the provocation or mistake-of-fact instruction, we hold that no cumulative error occurred here.

**D. The District Court Did Not Err When It Denied Defendant's Proposed Self-Defense Instruction**

**{21}** Defendant appealed the district court's denial of the self-defense instruction in relation to the first shooting, which impacted the Abeyta family. "In order to warrant jury instructions on self-defense, evidence must be sufficient to allow reasonable minds to differ regarding all elements of the defense." *Swick*, 2012-NMSC-018, ¶ 60. "If any reasonable minds could differ, the instruction should be

13

given." *Id.* (internal quotation marks and citation omitted). "An instruction on self-defense requires that (1) the defendant was put in fear by an apparent danger of immediate death or great bodily harm, (2) the [shooting] resulted from that fear, and (3) the defendant acted reasonably when he or she [shot at victims]." *Id.* (internal quotation marks and citation omitted). "The first two requirements, the appearance of immediate danger and actual fear, are subjective in that they focus on the perception of the defendant at the time of the incident." *State v. Rudolfo*, 2008-NMSC-036, ¶ 17, 144 N.M. 305, 187 P.3d 170 (internal quotation marks and citation omitted). However, "the third requirement is objective in that it focuses on the hypothetical behavior of a reasonable person acting under the same circumstances as the defendant." *Id.* (internal quotation marks and citation omitted). "When considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instructions." *Swick*, 2012-NMSC-018, ¶ 60 (alteration, internal quotation marks, and citation omitted).

{22}   The district court denied Defendant's self-defense instruction because there was no evidence that the Abeytas threatened him. However, in New Mexico, self-defense can transfer to an unintended target. *See State v. Abeyta*, 1995-NMSC-051, ¶ 31, 120 N.M. 233, 901 P.2d 164 ("[W]here an innocent bystander is accidentally killed during the attempt to defend oneself, the doctrine of self-defense provides a

14

defense against the unintended killing."), *abrogated on other grounds by State v. Campos*, 1996-NMSC-043, ¶ 32 n.4, 122 N.M. 148, 921 P.2d 1266. The State concedes that the district court erred in this analysis. However, we are not bound by this concession and conclude that the district court did not err in its analysis.

{23}    The State does not contest that Defendant was subjectively in fear and acted out of that fear. *See Swick*, 2012-NMSC-018, ¶ 60 (stating that a defendant must have been placed in fear and acted out of that fear to qualify for a self-defense instruction). We hold that the first two elements of self-defense are supported by sufficient evidence to warrant the instruction. Defendant and his girlfriend Brittany testified at length as to the threats Defendant had been receiving and testified that the occupants in the Escalade threatened Defendant with actual guns and gun gestures. The State contends that because Defendant recklessly endangered the Abyetas, the district court properly declined to issue Defendant's proposed self-defense instruction. Defendant's recklessness factors into the third requirement under the analysis, where this Court must determine whether reasonable minds could differ regarding the objective reasonableness surrounding Defendant's actions. *See id.* ¶ 60 (providing that the third requirement for a defendant to receive a self-defense instruction is there must be evidence that the defendant acted reasonably under the circumstances).

15

{24} Defendant presented evidence that it may have been reasonable for him to shoot back at the Escalade given the threats, alleged gunshots, and gestures of the occupants. However, Defendant did not shoot at or toward the Escalade itself. The Abeyta family's vehicle was between Defendant's vehicle and the Escalade when Defendant shot seven times at the ground. Defendant testified that he did not look back to ensure the Escalade was still following him when he started shooting. Upon review of the record as a whole, Defendant acted unreasonably and recklessly when he placed the Abeyta family in grave danger due to his actions. *See State v. Sutphin*, 2007-NMSC-045, ¶ 22, 142 N.M. 191, 164 P.3d 72 ("[A] defendant is not entitled to [a self-defense] instruction when the evidence is so slight as to be incapable of raising a reasonable doubt in the jury's mind on whether a defendant . . . did act in self-defense.") (omission in original) (internal quotation marks and citation omitted). Thus, we affirm the district court.

**E.   Juror Unanimity Is Currently Not Required on a Specific Theory of First-Degree Murder**

{25} Defendant asks this Court to overturn *State v. Salazar*, 1997-NMSC-044, 123 N.M. 778, 945 P.2d 996, and hold that in New Mexico, due process requires a jury to unanimously convict a defendant on a specific theory of first-degree murder. Defendant concedes that he did not preserve this argument, and thus, the appropriate standard of review is fundamental error. This Court may reach an unpreserved state

16

constitutional claim when the issue is of "unusual importance in the development of New Mexico law." *State v. Franklin*, 2018-NMSC-015, ¶ 10, 413 P.3d 861.

{26} Fundamental error "applies only under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Barber*, 2004-NMSC-019, ¶ 8, 135 N.M. 621, 92 P.3d 633. To overturn a conviction under a fundamental error standard, the question of guilt must "be so doubtful that it would shock the conscience of this Court to permit the conviction to stand." *State v. Orosco*, 1992-NMSC-006, ¶ 9, 113 N.M. 780, 833 P.2d 1146 (internal quotation marks and citation omitted). In the instant matter, the district court instructed the jury on two alternate theories of first-degree murder: willful-and-deliberate murder, and depraved-mind murder. The jury unanimously convicted Defendant of first-degree murder but did not specify which theory it adopted in doing so. Defendant declined to poll the jury, leaving the question unanswered. The State argues that by doing so, Defendant "may have waived his present claim."

{27} In *Salazar*, this Court reviewed an issue nearly identical to that here: in that case, "the State tried the [d]efendant on dual theories of first[-]degree murder: deliberate murder and depraved[-]mind murder. The jury returned a general verdict of guilty of first[-]degree murder." 1997-NMSC-044, ¶ 32. The *Salazar* Court held that

the trial court correctly instructed the jury that unanimity is not required as to one theory of first[-]degree murder where alternative theories are presented to the jury, and furthermore, a jury's general verdict will not be disturbed in such a case where substantial evidence exists in the record supporting at least one of the theories of the crime presented to the jury.

*Id.* The Court reasoned that (1) the UJI only requires unanimity as to a verdict and (2) depraved-mind murder is not a "step down" from willful-and-deliberate murder, in that "[d]epraved[-]mind murder involves blameworthiness and culpability comparable to deliberate premeditated murder." *Id.* ¶¶ 36-37, 42. Defendant argues that recent developments in the law require this Court to overturn *Salazar*. We disagree.

{28}     First, Defendant argues that one of the cases the *Salazar* Court relied upon, *Schad v. Arizona*, 501 U.S. 624, 629 (1991), has been partially overturned due to the fact that it "was grounded on the inapplicability of the Sixth Amendment to the states." In *Schad*, the defendant was tried on alternative theories of first-degree murder: felony murder and intentional murder. *Id.* at 628. The jury returned a general verdict, which the defendant appealed. *Id.* at 629. The defendant in *Schad* made an argument similar to the one Defendant makes here, that the trial court erred in not requiring a unanimous verdict as to the specific theory upon which the jury convicted the defendant. *Id.* at 630. The *Schad* Court upheld the conviction, concluding that the defendant's due process rights were not violated. *Id.*

18

{29} Defendant argues that the reasoning in *Schad* is "on shaky ground after the United States Supreme Court decided *Louisiana v. Ramos*, [140 S. Ct. 1390, 1397 (2020)], which held that the unanimity requirement does apply to the States." Defendant does not further develop this argument, likely because *Ramos* does not require specificity as to the theory upon which a jury convicts a defendant. *See Ramos*, 140 S. Ct. at 1395 ("A jury must reach a unanimous verdict in order to convict."). Defendant then points to the fact that Westlaw has a "red flag" next to *Schad* indicating that *Edwards v. Vannoy*, 141 S. Ct. 1547, 1553 (2021), recognizes the abrogation of that decision. Again, Defendant does not develop this argument further. This is likely because, as the State points out, *Edwards* only references a footnote in *Schad* that described how the law at the time did not require unanimous jury verdicts. *Schad*, 501 U.S. at 634 n.5. Thus, Defendant's arguments relating to *Schad*'s validity are unpersuasive given that its partial reversal is predicated on its reliance of the former law that juror unanimity is not required for felony convictions. *See id.* at 630 (declining to hold that the Sixth, Eighth, and Fourteenth Amendments require a unanimous jury sentence in capital cases).

{30} Defendant then turns to the New Mexico Constitution, arguing that it provides greater protection than the federal constitution. Article II, Section 18, Defendant argues, has been interpreted to provide greater protection than its federal counterpart.

19

Hence, Defendant asks this Court to revisit the first prong of the interstitial analysis set forth in *State v. Gomez*, 1997-NMSC-006, ¶ 20, 122 N.M. 777, 932 P.2d 1, which addresses whether federal analysis is "unpersuasive either because we deemed it flawed, . . . or because of undeveloped federal analogs." Defendant cites the dissent in *Schad*, which asserts unconstitutionality in the plurality's position by stating that "it violates due process for a State to invoke more than one statutory alternative, each with different specified elements, without requiring that the jury indicate on which of the alternatives it has based the defendant's guilt." *Schad*, 501 U.S. at 656 (White, J., dissenting). However, our caselaw does not require this level of specificity.

{31} Defendant urges this Court to examine the alleged discrepancy between *Salazar* and *State v. Consaul*, 2014-NMSC-030, 332 P.3d 850. The defendant in *Consaul* was convicted of child abuse resulting in great bodily harm, but the jury did not specify whether this conviction was predicated on negligence or intentional actions. *Id.* ¶ 24. The *Consaul* Court explained that "[f]or negligent child abuse, the State told the jury that [the defendant] put [the child] to bed carelessly (tightly swaddled and placed face down on a pillow)." *Id.* "For intentional child abuse, however, the [s]tate hypothesized that [the defendant] did not just put [the child] to bed carelessly, but that [the defendant] actually used a pillow or his hand to suffocate

20

[the child] so he could not breathe." *Id.* Additionally, the prosecutor "invited the jury to convict [the defendant] of child abuse whether or not the jury agreed on what criminal act [the defendant] actually committed." *Id.* ¶ 25.

{32} The *Consaul* Court held that "Jurors should not be left free, let alone encouraged by the prosecutor, each to go his or her own way when it comes to determining what criminal conduct—*if more than one act is alleged*—caused the child's harm." *Id.* (emphasis added). The Court also explained that "[w]hen two or more different or inconsistent acts or courses of conduct are advanced by the State as alternative theories as to how the child's injuries occurred, then the jury must make an informed and unanimous decision, guided by separate instructions, as to the culpable act the defendant committed and for which he is being punished." *Id.* ¶ 23. Defendant argues that this conflicts with *Salazar* such that *Salazar* must be overturned. The State does not respond to this argument.

{33} We determine that *Salazar* is distinguishable from *Consaul* in that *Consaul* repeatedly emphasizes that the jury must be unanimous as to which *act* caused the harm. Here, there is no question which act caused Cameron's death, and Defendant is informed, and testified to, his actions for which the jury found him criminally culpable. In contrast to the unanimity requirement in *Consaul* regarding a criminally

culpable act, no analogous unanimity requirement applies here under *Salazar* regarding a defendant's mens rea.

{34} Therefore, juror unanimity on a specific theory of first-degree murder is not currently required under the federal constitution nor under the New Mexico Constitution. Moreover, "Defendant does not offer, nor do we find, any reason to depart from our precedent regarding this issue." *State v. Riley*, 2010-NMSC-005, ¶ 35, 147 N.M. 557, 226 P.3d 656 (*overruled on other grounds by State v. Montoya*, 2013-NMSC-020, 306 P.3d 426). "We honor the principle of stare decisis and are reluctant to overturn precedent because it promotes stability of the law, fairness in assuring that like cases are treated similarly, and judicial economy." *Id*. ¶ 34. This Court considers several factors before overturning precedent:

> 1) whether the precedent is so unworkable as to be intolerable; 2) whether parties unjustifiably relied on the precedent so that reversing it would create undue hardship; 3) whether the principles of law have developed to such an extent as to leave the old rule no more than a remnant of abandoned doctrine; and 4) whether the facts have changed in the interval from the old rule to reconsideration as to have robbed the old rule of justification.

*Id.*

{35} Accordingly, while Defendant makes some sound arguments regarding our continued reliance on *Salazar*, we decline to overrule it in the absence of a persuasive stare decisis analysis. Additionally, Defendant makes no argument that insufficient

22

evidence supports either theory of first-degree murder upon which the jury may have relied. Thus, we conclude no due process violation occurred in this case.

**F.     Defendant's Multiple Charges of Shooting At or From a Motor Vehicle Without Bodily Injury Do Not Violate Double Jeopardy**

{36}     Defendant challenges his four charges of shooting at or from a motor vehicle in relation to the shooting incident involving the Abeytas. Defendant describes this as a unit-of-prosecution challenge, alleging multiple punishments for the same offense. We disagree and hold that multiple convictions for shooting at or from a motor vehicle not resulting in bodily injury do not violate double jeopardy.

{37}     No person shall "be twice put in jeopardy for the same offense." N.M. Const. art. II, § 15; U.S. Const. amend. V. Double jeopardy protects a defendant from three conceptually different types of harm. *Montoya*, 2013-NMSC-020, ¶ 23. One form of protection, known as a unit-of-prosecution claim, arises "when an individual is convicted of multiple violations of the same criminal statute." *See Torres v. Santistevan*, 2023-NMSC-021, ¶ 28, 536 P.3d 465 (internal quotation marks and citation omitted). "In analyzing a unit of prosecution claim, the relevant inquiry is whether the Legislature intended punishment for the entire course of conduct or for each discrete act." *Id.* (text only). This Court reviews double jeopardy claims de novo. *Id.* ¶ 27.

23

{38} *State v. Ramirez*, 2018-NMSC-003, ¶¶ 48-57, 409 P.3d 902, is helpful to guide this analysis. *Ramirez* analyzed the unit of prosecution for a child abuse statute, NMSA 1978, Section 30-6-1(D)(1) (2009). The *Ramirez* Court applied a two-step test to determine the Legislature's intent with respect to the unit of prosecution, beginning with review of the statutory language. 2018-NMSC-003, ¶ 47. The statute read, "Abuse of a child consists of a person knowingly, intentionally[,] or negligently, and without justifiable cause, causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health." Section 30-6-1(D)(1). The *Ramirez* Court first noted that "a defendant may be convicted of abuse by endangerment even where there is no evidence the abused child was injured. Indeed, the endangered child may be entirely oblivious to the endangerment." *Ramirez*, 2018-NMSC-003, ¶ 51. Thus, the *Ramirez* Court determined that one interpretation of the child abuse statute is that the Legislature intended to punish conduct rather than the resulting consequences of the criminal act. *Id.*

{39} Here, the pertinent language of the statute reads, "Shooting at or from a motor vehicle consists of willfully discharging a firearm at or from a motor vehicle with reckless disregard for the person of another." NMSA 1978, § 30-3-8(B) (1993). Defendant argues that the statute is ambiguous, urging this Court to move to step two of the test in *Ramirez* by applying the indicia-of-distinctiveness test. The State

24

argues that the plain language instructs that the Legislature intended for the crime to be punishable per individual placed in danger because of the singularity of the phrase "person of another." The language of the statute may be interpreted in two ways: to punish conduct or to punish per victim affected. Additionally, the plain language of the title of the statute "Shooting at dwelling or occupied building; shooting at or from a motor vehicle," suggests that the Legislature intended to punish the act of shooting at or from a motor vehicle rather than the resulting harm.

{40} The *Ramirez* Court further acknowledged that the plain language of the child abuse statute "rests on the fact that defendants can only engage in abuse of a child by endangerment if they cause or permit *a child* to be placed in a situation of endangerment." *Ramirez*, 2018-NMSC-003, ¶ 52. The singularity of the phrase "a child" suggested to the Court that "our Legislature intended the protections of [the statute] to attach to *each child* endangered, and this, in turn, suggests that the unit of prosecution for [the statute] is *by child*." *Id.*

{41} We read the statute at issue here similarly because of the Legislature's use of the phrase "the person of another," which suggests that the Legislature intended for the punishment to be per person whose safety the defendant "recklessly disregard[ed]." Section 30-3-8(B). Consequently, "there are two equally valid ways of thinking about the unit of prosecution for this statute: either by conduct or by

25

outcome." *Ramirez*, 2018-NMSC-003, ¶ 55. Therefore, as the *Ramirez* Court determined, we hold that "arguments on either side have equal force and validity"; thus, "the statutory language is ambiguous as to the unit of prosecution." *Id.* Accordingly, as did the *Ramirez* Court, we move on to the second step of the analysis. *Id.* ¶ 47.

{42} Under the second step of this analysis, we "determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute." *State v. Bernal*, 2006-NMSC-050, ¶ 14, 140 N.M. 644, 146 P.3d 289. "Our case law instructs that we consider the temporal proximity of the acts, the location of the victim(s) during each act, the existence of an intervening event, the sequencing of acts, and the defendant's intent as evinced by his or her conduct and utterances, and the number of victims." *Ramirez*, 2018-NMSC-003, ¶ 56. Importantly, this Court has recognized that "the number-of-victims factor has special significance: '[M]ultiple victims will likely give rise to multiple offenses.'" *Id.* ¶ 57 (quoting *Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624).

{43} In *Ramirez*, the defendant shot a victim nine times while three of his children were in the car. *Ramirez*, 2018-NMSC-003, ¶ 57. The Court observed that the case "involved multiple child victims who suffered distinct mental injuries as a

26

consequence of [the defendant's] actions." *Id.* Each child testified that they experienced mental anguish during the shooting and could have been injured significantly. *Id.* Thus, the *Ramirez* Court was "persuaded that our Legislature intended multiple punishments" to apply. *Id.* The facts of this case are similar, in that Defendant endangered each member of the Abeyta family in the vehicle. Defendant argues that this case is distinguishable because the children did not testify that they were in fear during the shooting. While that is true, Mary and William Abeyta testified about the fear that the family members experienced during the shooting as they believed Defendant was shooting at them. This testimony supports the similarity of the evidence here to that in *Ramirez*. Under these considerations, we hold that the Legislature intended multiple punishments should apply in this case. As a result, no double jeopardy violation occurred here.

**III.    CONCLUSION**

{44}    For the foregoing reasons, we affirm Defendant's convictions.

{45}    **IT IS SO ORDERED.**

_____

**C. SHANNON BACON, Chief Justice**

27

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Justice**

_____
**DAVID K. THOMSON, Justice**

_____
**JULIE J. VARGAS, Justice**

_____
**BRIANA H. ZAMORA, Justice**